Law Firm and requested a refund before filing this lawsuit. However, plaintiff did not receive a response back from Lexington Law Firm until after he filed this lawsuit. (Iosello Decl. ¶ 7) After his lawsuit was filed, on February 10, 2003, plaintiff received a letter dated February 14, 2003 from Lexington Law Firm stating that they had decided to give him a refund. To the best of his recollection, plaintiff did not receive the letter dated February 14, 2003 (Ex. 5 to Plf. Decl.) until February 18, 2003. (Iosello Decl. ¶ 8)

Clearly, defendant freely did business with plaintiff, a resident of Illinois. Defendant's multiple contacts with Mr. Iosello, as well as defendant's interactive Web site, show that defendant should reasonably anticipate being haled into a court in Illinois. Defendant's personal jurisdiction arguments should be disregard as an attempt to evade answering for his unlawful practices.

A.  **Jurisdiction Based on Defendant's Interactive Web Site**

The Lexington Law Firm uses the Internet to (i) invite persons in Illinois and other states to enter into contracts with it; and (ii) actually contract with those persons interactively on the Web site. See material printed from defendant's Web site in Appendix A. Defendant's Web site is clearly not used merely to passively promote or provide information about defendant's services. Rather, potential clients enter into contracts with defendant for the firm's services *through* the Web site. (Appendix B) This fact, standing alone, constitutes purposeful availment by defendant of the laws of those states where contracting customers live. Plaintiff himself used the interactive feature offered by defendant on the Web site, and actually contracted with defendant via the Internet. (Plaintiff's Declaration, Appendix C)

The affidavit offered by defendant is incomplete and deceptive. Defendant does

7

not reveal that he advertises his "nationwide" credit repair clinic extensively on the Internet. Defendant does not disclose that he pays "affiliates" located throughout the United States to link to his Web site. (Appendix D) Defendant does not reveal that he invites all communications with his clients (including plaintiff) to take place through Internet e-mail, rather than more traditional means of communication. (Appendix E; see also e-mail Exhibits to Iosello Decl., Appx. C)[2]

Furthermore, once the contract is entered into, defendant has extensive further contacts with Illinois. Defendant's Web site contains a list of "tradelines" that he claims to have successfully removed from clients' credit reports. (Appendix F contains the first 100 pages of the list for 1st quarter 2003) Many of those tradelines are from distinctively Illinois creditors and debt collectors, e.g., Sears Roebuck & Co. [headquartered in Hoffman Estates, IL]; Household/ HFC [headquartered in Prospect Heights, IL]; Van Ru Credit [Skokie, IL collection agency]; Harvard Collection [Chicago, IL collection agency]; "Cook County Reg. Chicago" [sic -- Recorder]; LaSalle Talman Mortgage [Chicago, IL]; LaSalle National Bank [Chicago, IL]; FNB Chicago and First USA (all part of Bank One organization headquartered in Chicago); Pullman Bank & Trust Company [bank located on South Side of Chicago]; Arrow Fincl [Lincolnwood, IL bad debt buyer and collection agency]; Illinois Masonic [Chicago, IL hospital]; Illinois Collection Service [Chicago area collection agency]). (Declaration of Daniel Edelman, Appendix I) While defendant's agents communicate with credit bureaus, they do so with the knowledge that the credit bureau is legally required to communicate with the creditor or debt

---

[2] Defendant's affidavit also claims that it is his policy to give complete refunds. That is not what his Web site says. (Appendix H)

8

collector that furnished the information and verify the "tradeline"; the credit bureau must delete or correct the tradeline if it is not verified within 30 days. Fair Credit Reporting Act, 15 U.S.C. §§1681i. 1681s-2.

Defendant thus regularly challenges the right of Illinois creditors and debt collectors to report information about consumers, many of whom are located in Illinois. Furthermore, the essence of the service advertised and sold by defendant is the making of such challenges. If, for some reason, defendant stated on his Web site that he would no longer challenge "tradelines" placed on credit reports by Illinois creditors and debt collectors, defendant would not be able to provide his services to *anyone.* Thus, defendant not only has extensive contacts with Illinois, but those Illinois contacts are an integral and essential part of the services that defendant sells and derives profit from.

In Berthold Types Ltd. v. European Mikrograf Corp., 102 F. Supp. 2d 928 (N.D. Ill. 2000), the court held that Internet activities are to be divided into three categories for jurisdictional purposes: (1) those in which the defendant clearly transacts business in foreign jurisdictions via the Internet, such as by accepting orders placed through a Web site (hence, a totally interactive site); (2) those in which a defendant has posted information on the Internet, but has no further communication with potential customers via the Internet; and (3) those in which the defendant operates an interactive Web site that allows defendant and potential customers in foreign jurisdictions to communicate regarding defendant's goods or services but not to actually enter into contracts or place orders. Accord, School Stuff, Inc. v. School Stuff, Inc., 00 C 5593, 2001 WL 558050 (N.D. Ill. May 21, 2001) (Guzman, J.); Ty Inc. v. Clark, 99 C 5532, 2000 WL 51816, *3 (N.D. Ill. Jan. 14, 2000); Inset Systems, Inc. v. Instruction Set, Inc., 937 F. Supp. 161

9

(D. Conn. 1996) (asserting jurisdiction over the defendant was consistent with Due Process concerns because the availability of the Web site in Connecticut showed that ISI was actively soliciting business in Connecticut); International Star Registry v. Bowman-Haight Ventures, Inc., 98 C 6823, 1999 WL 300285, *4-5 (N.D. Ill. May 6, 1999); Zippo Mfg. Co. v. Zippo Dot Com. Inc., 952 F. Supp. 1119, 1123-24 (W.D.Pa.1997) (setting forth "sliding scale" framework). Ultimately, whether a state may exercise personal jurisdiction is determined by "examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." Zippo, 952 F. Supp. at 1124. Thus, "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." Id.

Under this framework, courts can appropriately exercise personal jurisdiction over those defendants who fall into the first category by actively conducting business on the Internet via a totally interactive Web site. See, e.g., CompuServe Inc. v. Patterson, 89 F.3d 1257, 1264-65 (6th Cir.1996) (on-line contracts between defendant and plaintiff sufficient to exercise jurisdiction over defendant); School Stuff, Inc. v. School Stuff, Inc., supra, 00 C 5593, 2001 WL 558050 (N.D. Ill. May 21, 2001) (Guzman, J.); International Star, 1999 WL 300285 at *6 (jurisdiction proper where defendant generated revenue through direct commercial transactions with Illinois residents and derived profit from Web-related activity); Zippo, 952 F. Supp. at 1125-26 (defendant contracted with 3,000 individuals, representing two percent of defendant's customer base and seven Internet access providers in forum state).

Thus, defendant's transaction of business via the Internet would be sufficient to base jurisdiction on any claim flowing from that business. Under this test, defendant is subject to

10

jurisdiction here. Plaintiff contracted with defendant through the interactive Web site. (Plf. Decl., Appendix C) Moreover, plaintiff exchanged e-mails with the defendant through the Web site. (Id.) The interactive Web site "is roughly analogous to [defendant] setting up a 24-hour storefront in Illinois for [plaintiff's] use." Arnold v. Goldstar Financial Systems, Inc., 01 C 7694, 2002 WL 1941546 (N.D. Ill. Aug. 22, 2002), *6.

In Arnold v. Goldstar Financial Systems, Inc., 01 C 7694, 2002 WL 1941546 (N.D. Ill. Aug. 22, 2002), Judge Gottschall found personal jurisdiction proper over a Florida credit repair outfit that did business with two Illinois residents long-distance and was alleged not to have properly performed what it contracted to do. While more of the communications in Arnold were carried out by conventional means (mail and telephone), and fewer by Internet, there is no reason why a different result should obtain here simply because of the means of communication used.

### B. Jurisdiction Based on Unlawful Communication into Illinois

Furthermore, where, as here, the communication with the forum is not merely related to the claim, in the sense that letters and telephone calls forming a contract are related to a claim for defective goods supplied pursuant to the contract, but <u>constitutes</u> the actionable conduct, jurisdiction may constitutionally be based on even a single communication with the forum. For example, in a Fair Debt Collection Practices Act case, the sending of an illegal collection letter into a state allows that state to exercise jurisdiction over the persons responsible for the letter. Russey v. Rankin, 837 F. Supp. 1103, 1105 (D.N.M. 1993) ("Because TCA's written correspondence is the nucleus of the alleged wrongful conduct rather than just an ancillary contact with the forum, it was reasonable to anticipate being hailed [sic] into New

11

Mexico court on claims based upon the letter"); <u>Vlasek v. Rapid Collection Systems, Inc.</u>, 962 F. Supp. 1096 (N.D. Ill. 1997) (same); <u>Scott v. Universal Fidelity Corp.</u>, 98 C 3659, 1999 WL 684122 (N.D. Ill., Aug. 30, 1999) (same); <u>Sluys v. Hand</u>, 831 F. Supp. 321 (S.D.N.Y. 1993) (same); <u>Paradise v. Robinson and Hoover</u>, 883 F. Supp. 521, 525-26 (D. Nev. 1995) (same); <u>Norton v. Local Loan</u>, 251 N.W.2d 520 (Iowa 1977) (single collection call). Similarly, under the Fair Credit Reporting Act, reporting information concerning a consumer in a given state or accessing the credit report of a resident of a given state allows the exercise of jurisdiction by the courts of that state. <u>Liu v. DeFelice</u>, 6 F. Supp. 2d 106 (D. Mass. 1998) (defendant subject to Massachusetts jurisdiction when it accessed Massachusetts resident's credit report); <u>Bils v. Nixon, Hargrave, Devans & Doyle</u>, 880 P.2d 743 (Ariz. App. 1994); <u>Lachman v. Bank of La.</u>, 510 F. Supp. 753, 758 (N.D. Ohio 1981). Likewise, transmission of a defamatory or fraudulent communication into a state allows the exercise of jurisdiction by the persons injured as a result, in a suit for defamation or fraud. <u>National Petroleum Marketing, Inc. v. Phoenix Fuel Co., Inc.</u>, 902 F. Supp. 1459 (D.Utah 1995); <u>Thorington v. Cash</u>, 494 F.2d 582 (5th Cir. 1974); <u>Polish v. Threshold Technology Inc.</u>, 72 Misc.2d 610, 340 N.Y.S.2d 354 (Sup. Ct. 1974) (tortious act occurred where the person read the single fraudulent letter sent into state; no tortious act would have occurred if the letter had not reached its target).

In the present case, the gist of the claim is that defendant entered into a contract with an Illinois resident without complying with disclosure and substantive requirements imposed on such contracts by the CROA. The electronic communication with Illinois forming the contract <u>is</u> the conduct alleged to violate the CROA. Illinois can constitutionally exercise jurisdiction over defendant.

12

For these reasons, this Court can exercise personal jurisdiction over defendant.

## V.     THE CROA CLEARLY APPLIES TO LAWYERS

Defendant claims that he, as a lawyer, *cannot* be held liable for violation of the CROA. However, the plain language of the CROA refutes defendant's contention. In the alternative, defendant makes a policy argument that lawyers *should not* be held liable for violating the CROA. This argument arrogantly assumes that attorneys are somehow deserving of special exceptions to federal laws. They are not.

### A.     There is No CROA Exemption for Lawyers

The CROA provides its own definition of a "credit repair organization," and exempts those organizations Congress chose not to cover. There is no such exception as to attorneys or law offices.

> (3) Credit repair organization
>
> The term "credit repair organization"--
>
> (A) means <u>any person</u> who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of-
>
>> (i) improving any consumer's credit record, credit history, or credit rating; or
>>
>> (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and
>
> (B) <u>does not include</u>--
>
>> (i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of Title 26;
>>
>> (ii) any creditor (as defined in section 1602 of this title), with respect

13

...

> to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or
>
> (iii) any depository institution (as that term is defined in section 1813 of Title 12) or any Federal or State credit union (as those terms are defined in section 1752 of Title 12), or any affiliate or subsidiary of such a depository institution or credit union.

15 U.S.C. §1679a (emphasis added). If Congress had intended to make a special exception for attorneys who offer to repair credit, then it would have included attorneys among the list of exceptions. It did not, and there is no reason for defendant to be given an exception. Where the language employed by Congress is clear, the text controls and no further inquiry is permitted. Estate of Cowart v. Nichols Drilling Co., 505 U.S. 469, 475 (1992). There is no exception in the CROA for attorneys.

Congress undoubtedly learned its lesson from its experience with the Fair Debt Collection Practices Act, which initially contained an express attorney exemption. When it repealed the exemption for attorneys in 1986, Congress considered and rejected arguments that existing mechanisms for curbing lawyers' misbehavior are adequate and that application of the FDCPA to litigation would be burdensome. Congress expressly found "that current law does not adequately protect consumers from attorney debt collection abuses and that repeal of the attorney exemption to the Fair Debt Collection Practices Act is an appropriate way to reduce the amount of this abuse," H.R. Rep. No. 405 at 7, reprinted in 1986 U.S.C.C.A.N. at 1758.

The governing federal case law also does not support defendant's argument. FTC v. Gill, supra, 265 F.3d 944 (9th Cir. 2001) (attorney who contracted with consumers for credit repair services was liable under CROA).

**B.   Defendant is Not Acting as a Lawyer**

14

Finally, defendant's argument improperly assumes that he is in fact acting as a lawyer. Defendant's Web site claims that the four-lawyer firm has some 80,000 clients and removes entries from his clients' credit reports at the rate of 32,400 per month. (Appendix G)[3] Defendant cannot possibly be meaningfully involved as a lawyer, at that astonishing rate . Boyd v. Wexler, 275 F.3d 642 (7th Cir. 2001) Avila v. Rubin, 84 F.3d. 222 (7th Cir. 1996); Nielsen v. Dickerson, 307 F.3d 623 (7th Cir. 2002). If defendant's four lawyers each spent 250 hours per month doing nothing other than credit repair, and each and every "tradeline" challenged was removed and removed based on only one communication with the credit bureau, they would have to engage in 32-33 communications per hour with credit bureaus (less than two minutes each). This assumes that no time is spent reporting to clients, getting and examining their credit reports, determining whether grounds exist to challenge tradelines, etc. Furthermore, defendant claims in ¶ 3 of his affidavit that his law firm also handles "divorce, criminal law, and general litigation", so that the time they could spend on communications with credit bureaus is less.

Lexington Law Firm's operation is nothing more than a credit repair clinic using the facade of being a lawyer.

Defendant's Web site touts the "advantages of using a law firm." "We enforce your rights under the various federal laws." However, its Internet ad is deceptive: Mr. Lawrence admits in his affidavit that the firm does not act as a lawyer: "Were we to initiate legal action in [other] states we would be required to associate local counsel." (Aff. ¶ 12.) Lawyers who actually represent clients in Fair Credit Reporting Act matters commonly follow through with lawsuits, which must be filed where the client resides or the credit bureau or merchant is

---

[3] Most of the appendices are authenticated by Appendix I.

15

located. Indeed, if a lawyer is not prepared to file suit, the credit bureaus will not take him or her seriously.

## VI.  CONCLUSION

For the reasons stated, plaintiff respectfully asks that the Court deny the Motion to Dismiss.

Respectfully submitted,

*/s/ Anne M. Burton*

Anne M. Burton

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Anne M. Burton
EDELMAN, COMBS & LATTURNER, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

I:\case\lexing9.546\pleading\mtd.resp.wpd

16