*mem*
*exh*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

*FILED*
*SEP 27  9 47 AM '04*
*U.S.*
*NE...*

| | |
|---|---|
| MICHELLE GOKTEPE, | ) |
| Plaintiffs, | ) **MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY AND FOR SANCTIONS** |
| vs. | ) |
| VICTOR LAWRENCE, doing business as, LEXINGTON LAW FIRM, | ) Case No. 3:03CV0089-MRK |
| Defendant, | ) Honorable Judge Mark R. Kravitz |

COMES NOW Victor Lawrence d/b/a Lexington Law Firm, Defendant Pro Se, who hereby files his Memorandum in Support of Motion to Compel Discovery and for Sanctions, as follows:

### STATEMENT OF FACTS

1.      On July 9, 2004, Defendant scheduled and held the deposition of Plaintiff, Michelle Goktepe.  During the course of such deposition, Defendant attempted to question Plaintiff about the following: 1) whether she had been willing to accept Defendant's settlement offer in the case; 2) if not, why not; and 3) if not, which specific terms of the settlement offer had she been unwilling to accept—referring to specific terms of Defendant's proposed settlement offer.  See, Deposition Transcript of Michelle Goktepe Deposition, dated July 9, 2004, hereafter referred to as "Deposition Transcript," page 32, line 19, through and including page 65 line 19.  A copy of pages 1-9 and pages 26-69 of such Deposition Transcript has been attached hereto and incorporated herein as Exhibit "A."  (Defendant has attached only those portions of the deposition transcript that

he believed to be relevant to his motion, but is willing to provide the entire deposition

transcript at the request of the Court or opposing counsel.)

2.    During the above-described line of questioning, Defendant posed the

following questions to Plaintiff to which Plaintiff failed or refused to respond, or to which

Plaintiff gave a non-responsive answer, due to her improper actions or the improper

actions of her attorney:

1)    Let me ask this:  Were you willing to settle the claims in this lawsuit as
      a result of your discussions or as a result of your information?  (See,
      Deposition Transcript page 32, lines 19-22.)

2)    Tell me why you didn't sign the agreement and return it to Mr.
      Lawrence?  (See, Deposition Transcript page 34, line 24 through page
      35, line 2.)

3)    You didn't sign the agreement that Mr. Lawrence had signed and sent to
      you.  My question is:  Why didn't you sign that agreement and return it
      to Mr. Lawrence."  (See, Deposition Transcript page 35, line 23 through
      page 36, line 3.)

4)    Were you aware in order to pay you $30,000.00, Mr. Lawrence wanted
      you to agree not to defame him?  (See, Deposition Transcript page 36,
      lines 10-12.)

5)    My question is:  Mrs. Goktepe, were you aware or were you not aware
      that one of the provisions in the agreement that Mr. Lawrence sent to
      you that he had signed in which he had agreed to pay you $30,000, that
      in that agreement, he wanted you to agree not to defame him?  Were
      you aware of that?  (See, Deposition Transcript page 37, lines 3-11.)

6)    Were you unwilling to agree to not defame Mr. Lawrence?  (See,
      Deposition Transcript page 37, line 24 through page 38, line 1.)

7)    I don't want you to reveal to me any communications you had with your
      lawyer.  I am asking if you are unwilling to agree in a settlement that
      you would not defame Mr. Lawrence.  (See, Deposition Transcript page
      39, lines 4-9.)

8)    Mrs. Goktepe, are you unwilling to be paid $30,000 if one of the
      stipulations would be that you would agree not to defame Mr.

2

Lawrence?  (See, Deposition Transcript page 40, lines 20-23.)

9)      Mrs. Goktepe, are you unwilling to accept $30,000 in settlement of your complaints if one of the stipulations to that agreement would be that you keep the terms of the settlement confidential and not reveal them to third parties?  (See, Deposition Transcript page 41, lines 7-13.)

10)     Mrs. Goktepe, are you unwilling to enter into a settlement agreement from Mr. Lawrence under which you would be paid $30,000 because you are not willing to enter into an agreement, because you are not willing to [refrain from pursuing] any further litigation with Mr. Lawrence . . .   (See, Deposition Transcript page 41, line 21 through page 42 line 4.)

11)     Mrs. Goktepe, let me ask it this way:  Have you ever been unwilling to accept the payment of $30,000 from Mr. Lawrence in settlement of the claims in this lawsuit, because one of the conditions was that you would not agree to not defame Mr. Lawrence? (See Deposition Transcript page 42, line 19 through page 43, line 1.)

12)     Have you ever been unwilling to accept $30,000 from Mr. Lawrence in payment—in settlement of your claims against him because you were unwilling to agree not to defame him?  (See, Deposition Transcript page 43, lines 8-12.)

13)     Have you ever been unwilling to accept payment of $30,000 from Mr. Lawrence in settlement of your complaints against him because you were unwilling to agree to not defame Mr. Lawrence?  (See, Deposition Transcript page 44, lines 10-14.)

14)     Have you ever been unwilling to accept $30,000 from Mr. Lawrence in payment of your claims against him, because you were not willing to agree to keep the information regarding the settlement confidential? (See, Deposition Transcript page 45, lines 5-10.)

15)     Have you ever been unwilling to accept payment of $30,000 in settlement of your claims against Mr. Lawrence because you were not willing to agree not to continue pursuing further disputes with Mr. Lawrence?  (See, Deposition Transcript page 46, lines 6-11.)

16)     Have you ever been unwilling to agree to accept payment of $30,000 from Mr. Lawrence in settlement of your claim in this lawsuit because you were unwilling to sign an agreement stating that you had entered the settlement on the basis of instruction from your lawyer?  (See, Deposition Transcript page 47, lines 1-8.)

3

17)   Have you ever been unwilling to accept payment of $30,000 from Mr. Lawrence in settlement of your claims against him because the agreement that he proposed had a paragraph stating that you had followed advice of counsel in entering into the agreement? (See, Deposition Transcript page 47, lines 16-23.)

18)   Have you ever been unwilling to accept payment of $30,000 in settlement of your claims because the agreement that Mr. Lawrence proposed contained an integration clause? (See, Deposition Transcript page 49, lines 16-20.)

19)   Starting on page 5 of Exhibit 3, have you ever seen that settlement agreement that begins on page 5 and goes to the end of Exhibit 3? (See, Deposition Transcript page 52, line 22 through page 53, line 1.)

20)   I need you to listen to my question. I need you to look at Exhibit 3 on page 5 and review that document from there until the end of Exhibit 3, and review it in as much detail as you would like to do it. Tell me when you have finished reviewing it. Have you ever seen that document before today? (See, Deposition Transcript page 54, lines 9-17.)

21)   Mrs. Goktepe, was the document, that material as part of Exhibit 3 from page 5 to the end that is signed by Mr. Lawrence and myself, was that document—have you ever seen it before today? (See, Deposition Transcript page 57, lines 1-6.)

22)   Mrs. Goktepe, were you ever unwilling to accept payment of $30,000 to settle your claim in this case because you were unwilling to agree not to assist others in pursuing disputes with Mr. Lawrence? (See, Deposition Transcript page 61, lines 16-21.)

3.     During the above-described line of questioning, despite explicit instructions from Defendant's attorney—that Defendant did not wish to have Plaintiff disclose any attorney-client confidential communications—Plaintiff's attorney and Plaintiff engaged in the following inappropriate behavior: 1) Plaintiff's attorney repeatedly engaged in inappropriate dialogue and commentary concerning Defendant's questions, rather than simply stating Plaintiff's objections—including discussions about whether the case had been settled or whether Defendant wanted to engage in additional

4

settlement negotiations; 2) Plaintiff's attorney offered answers on behalf of Plaintiff or coached Plaintiff on what to say; 3) Plaintiff's attorney made repeated, improper objections to Defendant's questions on the basis that such information was not discoverable due to the attorney-client privilege, and improperly suggested or instructed that Plaintiff should not answer such questions; and 4) Plaintiff, on the suggestion or advice of her attorney, failed or refused to answer such questions. See, Deposition Transcript, page 32, line 19, through and including page 65, line 19.

     4.      Following Plaintiff's deposition, in which Plaintiff failed or refused to answer twenty-two (22) deposition questions posed to her by Defendant on the suggestion or advice of her attorney, Plaintiff also failed to file a motion for a protective order concerning the solicited responses to such unanswered deposition questions.

## ARGUMENT

**POINT 1: THE ACTIONS OF PLAINTIFF'S ATTORNEY IN SUGGESTING OR INSTRUCTING PLAINTIFF TO REFRAIN FROM ANSWERING THE DEPOSITION QUESTIONS SET FORTH ABOVE, AND THE ACTIONS OF PLAINTIFF IN FAILING OR REFUSING TO ANSWER SUCH DEPOSITION QUESTIONS WERE IMPROPER.**

**A. Scope of discoverable evidence.**

     The above-entitled court has stated the following concerning the proper scope of discovery:

> "The scope of discovery under FED. R. CIV. P. is very broad, encompassing any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to discovery of admissible evidence." Security Ins. Co. of Hartford v. Trusmark Ins., 218 F.R.D. 29, 32 (D. Conn. 2003) (Citations and quotations deleted); see also, Armstrong v. Hussmann Corp., 163 F.R.D.

299, 302 (E.D.Mo. 1995).

In this case, following settlement negotiations between the parties, but prior to Plaintiff's deposition, Plaintiff filed a motion for a settlement conference, seeking to have the court determine whether a settlement had been entered into between the parties, and if so, what the terms of such settlement were. By so doing, Plaintiff clearly put at issue the state of mind of the Plaintiff concerning what she perceived to be the terms of the proposed settlement and whether she was in agreement with the perceived terms of such proposed settlement. That subject matter formed the basis of all of the deposition questions posed to Plaintiff, which she improperly failed or refused to answer. Thus, according to the guidelines set forth in Fed R. Civ. Pro., Rule 26, the subject matter of the deposition questions posed to Plaintiff by Defendant (which Plaintiff failed or refused to answer) was within the scope of discoverable evidence.

**B. Refusal to answer deposition questions based on attorney-client privilege.**

As a general rule, instructions—by an attorney to a witness—not to answer questions at a deposition are improper. Rule 30(c) provides that "evidence objected to shall be taken subject to objection." The only exceptions to this rule are questions which seek information in the form of trade secrets and privileged information. Hisaw v. Unisys Corp., 134 F.R.D. 151, 152 (W.D. La. 1991); Nutmeg Ins. Co. v. Atwell, Vogel & Sterling, 120 F.R.D. 504, 508 (W.D. La. 1988); see also, Armstrong v. Hussmann Corp. supra, 163 F.R.D. at 302.

Plaintiff refused to answer Defendant's questions under the guise or pretext that such questions requested Plaintiff to disclose attorney-client privileged information. However, the requested information was clearly not subject to the attorney-client

6

privilege for either of the two reasons set forth below.

### 1) **First reason why the requested information was not privileged.**

The attorney-client privilege affords protection to information that "the client tells his attorney, not what the attorney tells the client (except, of course, to the extent the attorney's advice incorporates client confidences)." <u>Laker Airways Ltd. V. Pan American World Airways</u>, 103 F.R.D. 22, 40 (D.D.C. 1984).

At the deposition, Plaintiff's attorney suggested or instructed that Plaintiff should not respond to questions asked by Defendant concerning: 1) whether Plaintiff's attorney had conveyed to Plaintiff the full content of the settlement offer made by Defendant to Plaintiff, and 2) whether Plaintiff was aware of the full content of the proposed settlement offer made to her by Defendant (which should have been conveyed to her by her attorney). (See, Deposition Transcript page 36, line 10, through and including page 38, line 20; page 50, line 12, through and including page 56, line 5; and page 57, line 1, through and including page 61, line 11; the questions involved were Questions 4-5 and 19-21, as set forth above.)

It should have been obvious to Plaintiff's counsel that the information requested in Questions 4-5 and 19-21, as set forth above, was not covered by the attorney-client privilege, whereas such information did not involve any attorney-client communications. Rather, such requested information involved a communication between Defendant and Plaintiff, and the extent to which Plaintiff received and understood such communication. By this line of questioning, in part, Defendant was attempting to determine whether Plaintiff's attorney had fully conveyed Defendant's offer to Plaintiff or whether Plaintiff's attorney had withheld some of such information from Plaintiff. That information was

relevant, because it would allow Defendant to determine whether Plaintiff's counsel was

pursuing the lawsuit for an ulterior, bad faith purpose—rather than because the lawsuit

had any merit.  It was also relevant, because it would allow Defendant to assess

Defendant's credibility as a witness concerning the issue of whether there had been a

settlement of the case, based on the extent of Plaintiff's personal knowledge, if any, of the

settlement offer that Defendant had conveyed to her attorney. (Such issue was raised as

an issue in the lawsuit by Plaintiff's motion for a settlement conference.)  Thus, the

actions of Plaintiff's counsel in objecting to Questions 4-5 and 19-21, as set forth above

and in suggesting or instructing that Plaintiff should refuse to answer such questions, and

the actions of Plaintiff in refusing to answer such questions—on the pretext of attorney-

client privilege—were clearly improper and contrary to the Federal Rules of Civil

Procedure.

    **2) Second reason why the requested information was not privileged.**

    The above-entitled court has adopted as precedent the ruling of the 2nd Circuit

Court that "[a]lthough an attorney-client communication is privileged and may not be

divulged . . . the underlying information or substance of the communication is not . . . so

privileged."  In Re Six Grand Jury Witnesses, 979 F.2d 939, 945 (2nd Cir. 1992); Security

Ins. Co. of Hartford v. Trustmark Ins., supra, 218 F.R.D. at 33.

    At the deposition, Plaintiff's attorney suggested or instructed that Plaintiff should

not to respond to questions asked by Defendant concerning: 1) why Plaintiff did not sign

Defendant's proposed settlement agreement, and 2) to which provisions of Defendant's

proposed settlement agreement was Plaintiff unwilling to agree.  (See, Deposition

Transcript page 32, line 19, through and including page 36, line 8; page 38, line 21,

8

through and including page 50, line 6; and page 60, line 16, through and including page 65, line 19; the questions involved were Questions 1-3, 6-18 and 22, as set forth above.)

Plaintiff's attorney took the position, contrary to the law of this jurisdiction, that any information her client learned from her was subject to the attorney-client privilege, and therefore, was undiscoverable at Plaintiff's deposition. (See, Deposition Transcript page 39, lines 18-19 and page 40, lines 5-7.) However, as has been set forth above, this court has ruled that the underlying information or substance of an attorney-client privileged communication is not privileged. Therefore, Defendant's questions to Plaintiff about her state of mind or knowledge concerning why she did not accept the proposed settlement agreement and with which of its terms she did not agree—regardless of how Plaintiff obtained such information—requested "underlying factual information," which was clearly discoverable, and not subject to the attorney-client privilege. Accordingly, the actions of Plaintiff's counsel in objecting to Questions 1-3, 6-18 and 22, as set forth above, and in suggesting or instructing that Plaintiff should refuse to answer such questions, and the actions of Plaintiff in refusing to answer such questions—on the pretext of attorney-client privilege—were obviously improper and contrary to the law of this Court and to the Federal Rules of Civil Procedure.

## C. **Other improper actions of Plaintiff's counsel.**

> "In general, counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer . . . Because attorneys are prohibited from making any comments, either on or off the record, in the presence of a judicial officer, which might suggest or limit a witness's answer to an unobjectionable question, such behavior is likewise prohibited at depositions." Armstrong v. Hussmann Corp., supra, 163 F.R.D. at 303; compare, Frazier v. S.E. Pa. Transp. Authority, 161 F.R.D. 309, 315 (E.D.Pa. 1995) ("A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There

9

is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness formulate answers . . . It is the witness—not the lawyer—who is the witness").

At the deposition of Plaintiff, Plaintiff's attorney engaged in other improper deposition behavior, namely, inappropriate dialogue, argument and commentary concerning Defendant's questions, rather than simply stating objections to such questions; such dialogue included discussions about whether the case had been settled and subjective commentary concerning the appropriateness of such questions. (See, Deposition Transcript page 32, lines 23-24; page 33, lines 1-8; page 34, lines 5-8; page 35, lines 11-12, 16-17; page 36, lines 4-8, 16-18; page 37, lines 12-18; page 38, lines 2-4, 13-15; page 39, lines 10-14; page 40, lines 1-3, 17-18; page 42, lines 6-7, 9-11; page 43, lines 13-15; page 45, lines 13-17, 20-22; page 47, line 24; page 48, lines 1-6, 9-10, 14-15, 17-18, 20-21; page 49, lines 3-6; page 52, lines 14-16; page 53, lines 2-6, 10-11, 20-23; page 55, lines 6-7; page 56, lines 8-11, 17-20; page 57, lines 7-12; page 58, lines 6-11; page 59, lines 4-5, 18, 22-24; page 60, line 1; page 61, lines 4-11; page 62, lines 4-7, 15-16, 19-20, 24; page 63, lines 12-17, 23-24; page 64, lines 1-3; and page 65, lines 4-5.) Plaintiff's attorney also offered answers on behalf of Plaintiff or coached or suggested to Plaintiff how to answer. (See, Deposition Transcript page 35, lines 14-22; page 38, lines 18-20; page 39, lines 10-14, 18-19; page 40, lines 5-7; page 44, lines 15-17, 19-21; page 51, lines 5-8; page 52, lines 14-16; page 53, lines 2-4; and page 54, lines 18-20.)

Just the same as the examples of improper attorney behavior in the cases cited above, the behavior of Plaintiff's attorney in thwarting Defendant's attempts to obtain responses to Defendant's questions set forth above—namely, by engaging in lengthy,

argumentative discourses about the inappropriateness of the deposition questions, rather

than making objections that were concise, non-argumentative and non-suggestive (as

required by FRCP Rule 30(d)(1) ), by suggesting answers to the Plaintiff, and by arguing

with Defendant's attorney about whether a settlement had been reached—also constituted

improper behavior, contrary to the Federal Rules of Civil Procedure.

**D.  <u>Failure to file motion for protective order</u>.**

It is the majority rule of law that even if an attorney instructs a witness not to

answer a deposition question based on either trade secrets or privileged information, it is

the duty of the attorney instructing the witness not to answer to immediately seek a

protective order. <u>See</u>, <u>e.g.</u>, <u>Hisaw v. Unisys Corp.</u>, <u>supra</u>, 134 F.R.D. at 152; <u>Nutmeg Ins.</u>

<u>Co. v. Atwell, Vogel & Sterling</u>, <u>supra</u>, 120 F.R.D. at 508; <u>Hearst/ABC Viacom v.</u>

<u>Goodway Marketing</u>, 145 F.R.D. 59, 62 (E.D. Pa. 1992).  No protective order was sought

by Plaintiff concerning the information solicited by Defendant's deposition questions to

Plaintiff at Plaintiff's deposition.  For this reason alone, the court could grant Defendant's

motion to compel and for sanctions.  <u>See</u>, <u>Hisaw v. Unisys Corp.</u>, 134 F.R.D. at 153.

**E.  <u>Plaintiff has burden of proof</u>.**

Finally, the party asserting the attorney-client privilege bears the burden of

showing that the privilege applies.  <u>Hisaw v. Unisys Corp.</u>, <u>supra</u>, 134 F.R.D. 151 at 153.

As has been set forth above, Plaintiff cannot meet its burden to show that the attorney-

client privilege was applicable to Plaintiff's responses to Defendant's deposition

questions.

**F.  <u>Prayer for relief</u>.**

Based on the foregoing, Defendant respectfully requests the Court to grant

Defendant's motion to compel Plaintiff to respond to Questions 1-22 set forth above and all other unobjectionable deposition questions. Defendant also requests the Court to order Plaintiff to refrain from obstructing Defendant's future efforts to conduct depositions in this matter, by improperly asserting the attorney-client privilege as a pretext for refusing to answer Plaintiff's unobjectionable deposition questions, and by engaging in other improper deposition behavior.

**POINT 2:  THE ACTIONS OF PLAINTIFF AND HER ATTORNEY IN OBSTRUCTING DEFENDANT'S ATTEMPTS TO DEPOSE PLAINTIFF ARE SANCTIONABLE.**

FRCP Rule 37(4) mandates that the court should require the party whose conduct necessitated the motion to compel to pay the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust. 29 USC §1927 allows a court to require an attorney who "multiplies the proceedings in any case unreasonably or vexatiously" to personally satisfy the costs, expenses and attorney's fees reasonably incurred as a result of such conduct. In this case, there was no substantial justification or other circumstances that would preclude the Court from granting to Defendant an award for attorney's fees in prosecuting its motion to compel discovery. In addition, because Plaintiff's attorney unreasonably and vexatiously caused Defendant to expend additional effort and cost in obtaining the deposition responses of Plaintiff, Plaintiff's attorney should be held personally responsible for such additional costs, as well. See, e.g., Armstrong v. Hussmann Corp., supra, 163 F.R.D. at 303; Frazier v. S.E. Pa. Transp. Authority, supra, 161 F.R.D. at 317

12

## CONCLUSION

Based on the foregoing, Defendant respectfully requests the court to grant its motion to compel Plaintiff to attend a re-deposition, to answer the deposition questions set forth above and all other non-objectionable questions at such re-deposition, and to pay costs to Defendant, including attorney's fees incurred in prosecuting this motion and in conducting such re-deposition. <u>See</u>, <u>e.g.</u>, <u>Nutmeg Ins. Co. v. Atwell, Vogel & Sterling</u>, <u>supra</u>, 120 F.R.D. at 511. In addition, Defendant respectfully requests the court to require Plaintiff's attorney to be held personally responsible for such costs, including Defendant's attorney's fees, as well, pursuant to 28 USC §1927. Finally, Defendant respectfully requests the Court to direct Plaintiff's attorney to refrain from engaging in improper behavior, such as improperly asserting the attorney-client privilege and engaging in improper dialogue, argument and commentary concerning Defendant's deposition questions, at future depositions conducted by Defendant in this case.

DATED this _24th_ day of September, 2004.

Victor Lawrence
Defendant Pro Se
P.O. Box 1413
Bountiful, Utah  84011-1413
Tel.: (801) 244-2515
Fax: (801) 292-7575

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Memorandum

in Support of Motion to Compel Discovery and for Sanctions was served by First Class

U.S. mail, postage prepaid, and by Federal Express on this _24th_ day of September,

2004, to the following:


Joanne S. Faulker, Esq.
123 Avon Street
New Haven, CT  06511-2422


_Liz Perkins_

14

**EXHIBIT A**

1    IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF CONNECTICUT

3          NEW HAVEN DIVISION

4

5    CV 03:CV0089-MRK

6    -----------------------------------

7    MICHELLE GOKTEPE,

8    vs.

9    VICTOR LAWRENCE, d/b/a LEXINGTON LAW

10   FIRM.

11   -----------------------------------

12        Deposition of MICHELLE GOKTEPE,

13   taken pursuant to the Connecticut Practice

14   Book, before Corinne T. Thomas, LSR,

15   Licensed Shorthand Reporter #SHR.439 and

16   Notary Public within and for the State of

17   Connecticut, held at the offices of

18   Carmody & Torrance, 195 Church Street, New

19   Haven, Connecticut, on July 9, 2004, at

20   9:35 a.m.

21

22

23

24

Page 2

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF:
4  JOANNE S. FAULKNER, ESQ.
5  123 Avon Street
6  New Haven, CT  06511
7  (203) 772-0395
8
9
10  ON BEHALF OF THE DEFENDANT:
11  BLAKE S. ATKIN, ESQ.
12  ATKIN & HAWKINS, P.C.
13  Kearns Building
14  136 South Main Street, Suite 610
15  Salt Lake City, Utah  84101
16  (801) 533-0300
17  (801) 533-0380 - Facsimile
18
19
20
21
22
23
24

Page 4

1          STIPULATIONS
2
3     IT IS HEREBY STIPULATED AND AGREED
4  by and between counsel representing the
5  ... that each party reserves the right
6  to make specific objections at the trial
7  of the case to each and every question
8  asked and of answers given thereto by the
9  deponent, reserving the right to move to
10  strike out where applicable, except as to
11  such objections as are directed to the
12  form of the question.
13     IT IS HEREBY STIPULATED AND AGREED
14  by and between counsel representing the
15  respective parties that proof of the
16  official authority of the Notary Public
17  before whom this deposition is taken is
18  waived.
19     IT IS FURTHER STIPULATED AND AGREED
20  by and between counsel representing the
21  respective parties that the reading and
22  signing of the deposition by the deponent
23  is waived _____, is not waived __x__.
24

Page 3

1  INDEX:
2
3  EXAMINATIONS:
4                           PAGE
5  BY MR. ATKIN              6
6
7
8  EXHIBITS:
9                           PAGE
10  1                       22
11  2                       25
12  3                       50
13  4                       72
14  5                      118
15
16
17
18
19
20
21
22
23
24

Page 5

1     IT IS FURTHER STIPULATED AND AGREED
2  by and between counsel representing the
3  parties that all defects, if any, as to
4  the notice of the taking of the deposition
5  are waived.
6     Filing of the Notice of Deposition
7  with the original transcript is waived.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2 (Pages 2 to 5)

Page 6

```
1        MICHELLE GOKTEPE,
2    of 57 Ridge Lane, Shelton,
3    Connecticut, having first been duly
4    sworn, deposed and testified as
5    follows:
6
7        DIRECT EXAMINATION
8
9        MR. ATKIN: Just a preliminary
10   matter, Joanne, addressing this to
11   you, did you bring the deposition
12   exhibits that were marked yesterday at
13   the deposition of Mr. Lawrence?
14       MS. FAULKNER: I did.
15       MR. ATKIN: Thank you. I
16   appreciate that, because I may need to
17   refer to those as we go along today.
18   BY MR. ATKIN:
19   Q. Mrs. Goktepe, my name is Blake Atkin
20       with Atkin & Hawkins. I am here to
21       ask you questions about a complaint
22       you've brought against Victor Lawrence
23       doing business as Lexington Law Firm.
24       Do you understand that?
```

Page 8

```
1       home?
2    A. Right.
3    Q. You are attending nursing school?
4    A. Right.
5    Q. And because you weren't able to
6       refinance your home, you had to pay
7       for those classes?
8    A. Plus day care, baby-sitting, while I
9       am attending classes because my
10      husband is self-employed.
11   Q. Are there any other ways that you have
12      been damaged as a result of the
13      actions --
14   A. My credit is ruined. My credit is
15      poor, and I felt I was hiring a
16      company to clear that for me, and I
17      feel like I was misrepresented as far
18      as they don't do what they say they
19      will do.
20   Q. Anything else, any other ways in which
21      you have been damaged as a result of
22      the actions or inactions of Mr.
23      Lawrence's actions complained of in
24      your complaint?
```

Page 7

```
1    A. Yes, I do.
2    Q. Would you tell me all of the ways that
3       you have been damaged by the actions
4       of Mr. Lawrence as you have complained
5       of in your complaint?
6    A. I basically hired them to clear my
7       credit, and he didn't do what he was
8       told.
9    Q. And have you suffered any damages as a
10      result of his failure to clear your
11      credit?
12   A. Yes.
13   Q. Please tell me what those are.
14   A. We recently tried to refinance our
15      home that we have been living in for
16      10 years, with the value increasing,
17      almost doubling, and I am applying for
18      nursing school and we couldn't borrow
19      money against our home for me to go to
20      school because of my credit, which has
21      jeopardized our family. We have three
22      children and my husband is the only
23      one working at this time.
24   Q. You have attempted to refinance your
```

Page 9

```
1    A. Well, to have your credit ruined and
2       not be cleared up is harm enough, I
3       think.
4    Q. Tell me about the refinance of your
5       home. When did you --
6    A. Let me back up.
7        MS. FAULKNER: Wait until he
8    finishes.
9    BY MR. ATKIN:
10   Q. Give me the address of your home.
11   A. 57 Ridge Lane, Shelton, Connecticut.
12   Q. And you own that home?
13   A. Yes.
14   Q. Do you own it with your husband?
15   A. It's in my name now.
16   Q. It's in your name now; when wasn't it?
17   A. It's in my name, because it's safer
18      that way.
19   Q. Safer?
20   A. Safer as in my husband is
21      self-employed, and we don't want to
22      have any problems as far as our home
23      being taken from us.
24   Q. Was there a time when your home was in
```

3 (Pages 6 to 9)

**Page 26**

1    complaint before it was filed in this
2    action?
3    A.  I don't recall.
4    Q.  Let me show you a document that has
5        been marked as your deposition Exhibit
6        No. 2, and I will purport to you that
7        this is the second amended complaint
8        in this action that was filed by Ms.
9        Faulkner.  Have you ever had a chance
10       to review that second amended
11       complaint?
12   A.  I read it through.
13   Q.  When did you read it through?
14   A.  I don't recall.
15   Q.  Do you know if you read it through
16       before it was filed with the court?
17   A.  I must have.
18   Q.  Why do you say that?
19   A.  Because if it was amended, I would
20       have read it and then Jay would send
21       it.
22   Q.  Jay would send it?
23   A.  Who?
24   Q.  Who did you say would send it?

**Page 27**

1    A.  I said then Ms. Faulkner would send
2        it.
3    Q.  When you read through the second
4        amended complaint, were the
5        allegations made, as you read them
6        there, accurate and true?
7    A.  From what I could understand.
8    Q.  What part of the second amended
9        complaint did you not understand?
10   A.  I understand the specific complaints
11       that I was making.  I was a little
12       confused about the other complaint
13       that was filed.
14   Q.  Do you recall specifically any of this
15       complaint that confused you?
16   A.  Nothing specific.
17   Q.  And did you ultimately come to
18       understand what the complaints were
19       being made in this second amended
20       complaint?
21   A.  Yes.  That I was being falsely
22       represented, saying that there was
23       forgery going on, and things like
24       that.

**Page 28**

1    Q.  We will get into that in just a
2        minute.  Let me change subject
3        little bit.  You are aware that
4        recently there were some serious
5        settlement discussions going on
6        between your lawyer and lawyers for
7        Mr. Lawrence?
8    A.  I don't know.  What kinds?  I am not
9        sure.
10   Q.  Are you aware that there were
11       settlement discussions between your
12       lawyer, Ms. Faulkner, and Mr.
13       Lawrence?
14   A.  I was under the impression that my
15       credit was going be cleared because
16       she was following up.
17   Q.  Let me shift gears here.  Recently,
18       are you aware that in the last month,
19       there have been discussions between
20       Ms. Faulkner, on your behalf, and
21       lawyers of Mr. Lawrence regarding
22       settlement of the lawsuit that you
23       filed against Mr. Lawrence?
24   A.  Yes.

**Page 29**

1    Q.  And you are aware that Mr. Lawrence
2        offered to pay you a substantial sum
3        of money in settlement of the claims
4        in this lawsuit?
5    A.  I don't know how much.  I don't know
6        what the amount is.
7    Q.  Were you ever told how much Mr.
8        Lawrence had offered to pay you?
9    A.  Not to my knowledge.  My husband does
10       a lot of our bills and financing.
11   Q.  Is your testimony that Ms. Faulkner
12       never told you the amount of money
13       that Mr. Lawrence was willing to pay
14       you to settle the claims in this
15       lawsuit?
16   A.  I was aware we were going settle, but
17       I am not sure what the amount was.
18   Q.  You were never told what the amount
19       was that was offered?
20   A.  No.  It's possible she told my husband
21       who is out of the country now.  He
22       does all the bills
23       at the house.
24   Q.  But you are the plaintiff in this

Page 30

1   lawsuit, right, not your husband?
2   A.  Right.
3   Q.  Were you aware that Mr. Lawrence had,
4       in fact, prepared a settlement
5       agreement that he had conveyed to Ms.
6       Faulkner that he had actually signed
7       agreeing to pay you a substantial
8       amount of money to settle the case,
9       and that agreement was refused?
10  A.  I don't recall that.
11  Q.  Is it your testimony that you were
12      never told that Mr. Lawrence had
13      forwarded to Ms. Faulkner a settlement
14      agreement in which he agreed to pay
15      you a substantial sum of money, and
16      that he had actually signed the
17      agreement and that all you needed to
18      do was sign the agreement and return
19      it and you would receive that payment
20      of money?
21  A.  I remember talk of certain things, but
22      I don't remember specific dates.  I
23      can't recall.
24  Q.  Well, this just happened in the last

Page 31

1       month.
2   A.  I was studying for finals.  My husband
3       does the bills, so he probably talked
4       about it.
5   Q.  Did Ms. Faulkner talk to you and
6       convey the fact that Mr. Lawrence had
7       offered to pay you a substantial
8       amount of money to settle the claims
9       in this lawsuit?
10  A.  I don't remember.
11  Q.  Were you ever told that Mr. Lawrence
12      had offered to pay you $30,000 to
13      settle the claims in this lawsuit?
14  A.  I wasn't told any amount of anything.
15  Q.  So it's your testimony, as you sit
16      here today, that Ms. Faulkner never
17      communicated to you that Mr. Lawrence
18      had agreed to pay you $30,000 to
19      settle the claims in this lawsuit?
20  A.  She probably communicated with my
21      husband who communicated with me.
22  Q.  My question to you is:  Did Ms.
23      Faulkner communicate to you that Mr.
24      Lawrence had sent a settlement

Page 32

1       agreement, which he had signed in
2       which he had offered to pay you
3       $30,000 to settle the claims in this
4       lawsuit, and all you needed to do was
5       sign that agreement and return it and
6       you would receive that money?
7   A.  I don't remember.
8   Q.  You don't remember?
9   A.  I don't.
10  Q.  Do you remember any discussions that
11      you had with Ms. Faulkner where an
12      offer to settle was communicated with
13      you?
14  A.  I remember communications that there
15      was a settlement.  I can't remember
16      specific amounts, specific time
17      frames.  I kept pushing it on the
18      back shelf.
19  Q.  Let me ask you this:  Were you willing
20      to settle the claims in this lawsuit
21      as a result of your discussions or as
22      a result of your information?
23          MS. FAULKNER:  I think you need
24      to terminate this line of discussion

Page 33

1       of questioning.  You probably should
2       have terminated it earlier, but what
3       you are getting into is privileged
4       attorney-client communication.  You
5       are getting into settlement
6       negotiations and you are asking
7       questions that seriously misrepresent
8       the fact situation, and you are not --
9           MR. ATKIN:  Are you going to make an
10      objection?  Why don't you make an
11      objection if you are going to make an
12      objection.
13  BY MR. ATKIN:
14  Q.  I need you to answer my question.
15          MS. FAULKNER:  I would direct
16      her to not answer.
17  BY MR. ATKIN:
18  Q.  I don't want you to tell me any
19      attorney-client communications.  In
20      the last month, you understood that
21      Mr. Lawrence had made a significant
22      settlement offer to you; is that
23      correct?
24          MS. FAULKNER:  Again, that

9 (Pages 30 to 33)

**Page 34**

1    would be attorney-client
2    communications.
3        MR. ATKIN:  It's not
4    attorney-client communications.
5        MS. FAULKNER:  I did send you her
6    signed agreement to accept $30,000,
7    and you have a copy of that agreement
8    that she signed to accept the $30,000.
9    BY MR. ATKIN:
10   Q.  My question is, Mrs. Goktepe, is were
11       you aware that Mr. Lawrence had
12       delivered a settlement agreement which
13       he had signed under which he agreed to
14       pay you $30,000 and all you needed to
15       do was sign the agreement and send it
16       to him and you would have received
17       that money?
18       MS. FAULKNER:  Once again,
19   anything she knew would be through
20   attorney-client communications.
21   BY MR. ATKIN:
22   Q.  Were you aware of that?
23   A.  Yes, she was handling it.
24   Q.  Tell me why you didn't sign the

**Page 35**

1    agreement and return it to Mr.
2    Lawrence?
3        MS. FAULKNER:  Once again, that
4    is privileged attorney-client
5    communication.
6    BY MR. ATKIN:
7    Q.  I don't want to know about the
8        attorney-client communications.  I
9        want to know your state of mind.  I
10       want to know why you did not want --
11       MS. FAULKNER:  She did accept
12   $30,000 in settlement of her claims.
13   BY MR. ATKIN:
14   Q.  Why didn't you sign the agreement and
15       return it?
16       MS. FAULKNER:  She did sign an
17   agreement and return it.
18   BY MR. ATKIN:
19   Q.  Why didn't you sign the agreement Mr.
20       Lawrence had signed and return it to
21       him for payment of $30,000?
22   A.  I did sign it.
23   Q.  You didn't sign the agreement that Mr.
24       Lawrence had signed and sent to you.

**Page 36**

1    My question is:  Why didn't you sign
2    that agreement and return it to Mr.
3    Lawrence?
4        MS. FAULKNER:  That is
5    attorney-client privilege.  If you
6    care to have a settlement
7    conference, we can do that, but you
8    have declined the opportunity.
9    BY MR. ATKIN:
10   Q.  Were you aware that in order to pay
11       you $30,000, Mr. Lawrence wanted you
12       to agree not to defame him?
13       MS. FAULKNER:  Attorney-client
14   privilege.
15       MR. ATKIN:  I am just asking --
16       MS. FAULKNER:  If you want to
17   negotiate the settlement agreement,
18   you may do it with me.
19       MR. ATKIN:  You filed a motion
20   for a settlement conference with
21   regards to these issues.  These are
22   issues in the lawsuit now as a result
23   of your motion, and I am entitled
24   to do discovery with regard to these

**Page 37**

1    issues.
2    BY MR. ATKIN:
3    Q.  My question is:  Mrs. Goktepe, were
4        you aware or were you not aware that
5        one of the provisions in the agreement
6        that Mr. Lawrence sent to you that he
7        had signed in which he had agreed to
8        pay $30,000, that in that
9        agreement, he wanted you to agree not
10       to defame him?  Were you aware of
11       that?
12       MS. FAULKNER:  Once again, we are
13   going to terminate this line of
14   discussion.
15       Settlement can be discussed in
16   an appropriate place.  It cannot be
17   discussed directly with my client
18   under any circumstances.
19       MR. ATKIN:  It is the issue in
20   the lawsuit as a result of a motion
21   you had made.
22       MS. FAULKNER:  It is not.
23   BY MR. ATKIN:
24   Q.  Were you unwilling to agree to not

10 (Pages 34 to 37)