UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHELLE GOKTEPE

v.                          CASE NO. 3:03CV 0089 (MRK)

VICTOR LAWRENCE d/b/a/
    LEXINGTON LAW FIRM                November 24, 2004

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE ELECTION TO APPEAR PRO SE

Defendant has been purporting to proceed pro se since his attorneys were permitted to withdraw on October 15, 2004. However, he represents not only himself, but a business entity comprising several lawyers and dozens of support staff called Lexington Law Firm. Defendant characterized "Lexington Law Firm" as "the largest consumer protection law firm in the United States" in his biographical statement for a December 3, 2004, Continuing Legal Education seminar (copy attached). A law firm has obligations not only to its employees but also to its clients. Documents recently received by the undersigned show that Lexington Law has been maintained and managed by a nonlawyer, Jayson Orvis, who owns, directly or through his companies, the assets and software used by Lexington. See ¶3 of Agreement dated May 21, 1999, copy attached. An Operational Services Agreement signed by Orvis and Lawrence dated May 2001 (particularly ¶ 8) confirms that an Orvis company, Far Cliffs Multimedia, controls the use of such assets and software. The trade name "Lexington Law Firm" also belonged to Jayson Orvis. See Assignment dated Jan. 12, 2001, copy attached. Thus, Lexington Law's extensive obligations to employees, clients, and Jayson Orvis or his entities preclude defendant from pro se representation.

Defendant, as part of an entity that includes many other individuals, cannot appear pro se. Pridgen v. Andresen, 113 F.3d 391, 393 (2d Cir. 1997).

> Nevertheless, appearance pro se denotes (in law latin) appearance for one's self; so that a person ordinarily may not appear pro se in the cause of another person or entity. Thus it is well established that a layperson may not represent a corporation, see Shapiro, Bernstein & Co. v. Continental Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam), may not assert pro se a claim that has been assigned to the litigant by a corporation, see Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983), and may not appear pro se to pursue a shareholder's derivative suit, see Phillips v. Tobin, 548 F.2d 408, 411-12 (2d Cir. 1976). We have also held that a layperson may not represent a partnership, see Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1310 (2d Cir. 1991), or appear pro se on behalf of his or her minor child, see Cheung, 906 F.2d at 61. These limits on pro se representation serve the interests of the represented party as well as the interests of adversaries and the court. See Jones, 722 F.2d at 22.

Id. at 393. Pridgen held that an administratrix of an estate could not appear pro se "when the estate has beneficiaries or creditors other than the litigant." The principle applies here.

The Second Circuit addressed the problem of pro se representation again in Iannaccone v. Law, 142 F. 3d 553 (2d Cir. 1998). "Thus, the threshold question becomes whether a given matter is plaintiff's own case or one that belongs to another." Id. at 558. Here, as in Iannaccone, it appears that the personal interests of several others -- employees, clients, owners of the firm's assets, and management consultants -- will be affected by the outcome of this proceeding.

Defendant, a Utah lawyer, is aware of Utah standards found at http://www.utcourts. gov/courts/appell/prose.htm: "Keep in mind that as a pro se litigant, you are representing only yourself. The law prohibits you from speaking for another person, company, or entity such as a club or association that includes other individuals."

At his deposition of November 19, 2004, defendant mentioned that he had appointments with several Connecticut attorneys that day. His Connecticut connections should allow him to obtain local counsel readily. Indeed, defendant's depositions have all been located at Carmody &

Torrance, the firm that represented Bradley Ross Law, an Indiana credit repair organization set up by Jayson Orvis.

A transcript of the deposition will be filed when available. The deposition was scheduled to conclude defendant's earlier deposition in which he refused to provide "confidential information." Defendant was sworn in but refused to answer questions or identify documents, in defiance of Fed. R. Civ. P. 36. His tactic may underscore the Court's inherent power over its proceedings as a basis for ordering him to appear by counsel. Rule 30(b)(6) depositions approved by the Court back in April were renoticed for Nov. 23 and 24, but when the court reporter and videographer got to the site, they were told the depositions had been cancelled!

The conduct is likely to be one of the topics of a discovery conference now scheduled for December 2, 2004. A pro se attorney is held to the same standards as lawyers. Holtz v. Rockefeller & Co., 258 F.3d 62, 82 n.4 (2d Cir. 2001); Harbulak v. County of Suffolk, 654 F.2d 194, 198 (2d Cir 1981). Even a lay pro se must become familiar with and comply with procedural rules. LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir. 1995); Edwards v. I.N.S., 59 F.3d 5, 8 (2d Cir. 1995).

        THE PLAINTIFF

        BY____/s/ Joanne S. Faulkner___
        JOANNE S. FAULKNER ct04137
        123 Avon Street
        New Haven, CT 06511-2422
        (203) 772-0395
        j.faulkner@snet.net

   This is to certify that the foregoing was mailed on November 23, 2004, postage prepaid, to:

Victor Lawrence pro se
PO Box 1413
Bountiful UT 84011-1413

            _/s/ Joanne S. Faulkner_____
             Joanne S. Faulkner

http://www.lorman.com/seminars/seminar_faculty.php?pid=75293&t...



**Credit Reports And The Law**
December 3, 2004
Salt Lake City, UT

Single Attendee: $319.00
Two or More: $309.00

Adobe PDF

Text Only

FAQ

BENEFITS | AGENDA | CREDIT

**Menu**
Home
Seminars
Bookstore
Customer Support
Become a Speaker
About Lorman
Contact Us

**Shopping Cart**
View Cart
Checkout

**Faculty**

JoAnn Jackson, IFCCE currently is the owner of J. Jackson & Associates, a collection therapist management consulting firm in Utah and CFO of DJS Enterprises, Inc., an automated payment firm. Ms. Jackson is well known for her collection, credit and management expertise. She works very closely with many local businesses to develop policies and procedures which insure a smooth, efficient and cost effective office. Ms. Jackson has conducted seminars for the Chamber of Commerce, the Better Business Bureau, the Utah Apartment Association, the Institute of Real Estate Managers, the International Credit Association, as well as for many companies both large and small. She served for eight years as the state education coordinator for the American Collectors Association International. Ms. Jackson has her collector certification, in which only a few collectors in the nation have achieved this level of certification. In addition, she has awards which include the International Fellowship of Certified Collector Executive.

Victor Lawrence, for the past 7 years has been the directing attorney for Lexington Law Firm, the largest consumer protection law firm in the United States. He received his undergraduate degree from Brigham Young University and his J.D. degree from the J. Reuben Clark School of Law at BYU the following year. Mr. Lawrence has served as an adjunct professor at BYU from 1985-1986, judge pro tempore for small claims court in Salt Lake City, Utah from 1986-1988, and was one of the founding members to Utah's Governor's Polynesian Advisory Council. He has a strong litigation background with an adept and efficient transactional practice.

David E. Leta is a partner in the Salt Lake City law firm of Snell & Wilmer, L.L.P., where his practice concentrates on bankruptcy litigation, business reorganizations and creditor rights. For over 27 years, Mr. Leta has represented creditors, debtors, committees and trustees in a wide variety of commercial settings. He is a graduate of the State University of New York at Binghamton (fka, Harpur College), and graduated with high honors. Mr. Leta received his J.D. degree from the University of Utah College of Law where he was on the Law Review editorial board. He is a member of the Order of the Coif and Phi Beta Kappa. Mr. Leta also is a member of the American Bar Association, the Utah State Bar (organizer and first chairman of the Bankruptcy Section), the American Bankruptcy Institute and is a Fellow in the American College of Bankruptcy. Mr. Leta is admitted to practice before the United States Supreme Court, the U.S. Courts of Appeal for the 9th and 10th Circuits, the U.S. District Court, Utah, the U.S. Tax Court and the Supreme Court of Utah. Since 1995, he has been continuously recognized by his peers in Woodward/White, Inc. as one of the Best Lawyers in America. Mr. Leta currently serves as the co-chair of the ABI Rocky Mountain Bankruptcy Conference, and has been a

**Radisson Hotel Airport**

2177 West North Temple
Salt Lake City, UT
84116

(801) 364-5800

8:30 a.m. to 4:30 p.m.

Find this seminar 
in other locations.

View more seminars in
these topic areas.
* Banking
* Tax
* General Business
* Payroll
* Legal

(List all topics...)

**Purchase Products
from this Seminar**

CD & Manual   $339.00

Manual   $109.00

These items will ship 
4-6 weeks after the
seminar.

# AGREEMENT

AGREEMENT entered into this 21st day of May, 1999, by and between Jamis M. Johnson and Victor Lawrence.

## RECITALS

WHEREAS, Johnson is an attorney who has maintained a practice in the area of consumer credit and debt repair ("credit law practice"); and wherein Johnson has developed a national clientele under the name of Lexington Law Firm, a registered dba of Johnson; and

WHEREAS, Johnson desires to discontinue credit law practice and provide for the continued representation of clients and of the credit law practice; and

WHEREAS, Lawrence is a duly licensed attorney who desires to start a credit law practice and is willing to take responsibility for the existing clientele of Lexington Law Firm subject to the terms and conditions herein.

NOW, THEREFORE, in consideration of the terms and conditions herein and for other good and valuable consideration the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto mutually covenant and agree as follows:

1. Lawrence agrees to assume representation of the clients of Lexington Law Firm as presently constituted and Lawrence agrees to fulfill all obligation to the said clients as required under their retainer agreements with Lexington Law Firm.

2. Johnson agrees to withdraw from representation and does so as of this date, but the parties agree that they will take any and all steps necessary and lawful to assure

continued and professional representation during this transition.

3.  The parties acknowledge that the Lexington Law Firm clients and the credit law practice have been maintained and managed professionally by the services of Jayson Orvis and his management group and assets, which assets have included, without limitation, equipment and computers and furniture leasing, telephone equipment leasing, computer management software, marketing efforts, internet support, web-sites, URLs, literature and intellectual property, etc., (hereinafter collectively referred to as "Orvis") and the parties agree that in order to maintain the high quality of services and representation of the clientele and the appropriate and lawful continuation of the credit law practice, Lawrence agrees to continue to fully engage the services provided by Orvis. Lawrence further agrees not to disclose or appropriate any asset of Orvis to any third party nor to use any asset of Orvis to establish another credit law practice. This paragraph shall remain in effect and be binding so long as Lawrence maintains a credit law practice of any nature similar to the Lexington Law Firm practice.

4.  The parties acknowledge that the trade name Lexington Law Firm or Lexington Law Firms, while registered in the name of Jamis Johnson is the property of Orvis having been heretofore assigned previously.

5.  The parties acknowledge and agree that Victor Lawrence, by use of the name Lexington Law Firm may be adopting its use herein as a trade name and that this transaction is in no way the acquisition of the shares of a business or corporation or the assumption of liability, if any, heretofore, incurred by Johnson under the name Lexington

Law Firm or otherwise.

6. The parties acknowledge and agree that Lawrence does not intend to, nor does he in fact, assume or acquire any liabilities that may affect Jamis Johnson or his practice, including, without limitation, any issue related to or involving the Federal Trade Commission, the State of Tennessee, the Utah Department of Consumer Protection, the Utah State Bar, the IRS or any other entity. Johnson shall continue to be liable for all such issues or matters, if any, that occur before the date of this agreement.

7. In correlation with the credit law practice, Johnson has established attorney trust accounts to service the clients. Lawrence will establish his own trust accounts to service all credit law practice clients and the accounting for and trusteeship of attorney trust accounts and any funds therein shall be transferred in accordance with the law and all applicable Rules of Professional Conduct. Lawrence shall immediately establish his own operating accounts for his credit law practice.

DATED on the date first above written.

_____
Jamis M. Johnson

_____
Victor Lawrence

# OPERATIONAL SERVICES AGREEMENT

THIS OPERATIONAL SERVICES AGREEMENT entered into on the First day of May, 2001, by and between Lexington Law Firm, P.C. ("CUSTOMER"), a Utah professional partnership, and Far Cliffs Multimedia, L.L.C. ("VENDOR"), a Utah limited liability company.

RECITALS:

A.  CUSTOMER is a Utah professional partnership comprised of licensed attorneys duly authorized to practice law within the State of Utah.

B.  Among other areas of practice, CUSTOMER provides credit repair services (referred to herein as "CRS," as more particularly described below) to various clients in need of such CRS.

C.  VENDOR has considerable expertise in assisting legal professionals and others in the operational management of a professional practice and/or business ventures designed and operated for the purposes of providing CRS.

D.  VENDOR has acquired and/or developed certain tradenames, developed computer software and other automated systems, and designed operational procedures, all for the purpose of assisting those in the business of providing CRS to their respective clientele.

E.  CUSTOMER desires to retain VENDOR for the purposes of licensing VENDOR's tradenames, software and other operational procedures in furtherance of CUSTOMER's CRS practice area, all pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.  **Definitions.**

    1.1 "**Confidential Information**" means, individually and in any combination thereof, any and all confidential or proprietary information of VENDOR that is unique, not generally known in the CRS industry, gives VENDOR a competitive advantage, and/or enhances VENDOR's good will, whether or not reduced to writing and whether or not patentable or protected by copyright. Confidential information includes, but is not limited to business techniques, business methods, technology, products, services, trade secrets, ideas, copyrights, trademarks, service marks, methods, formulae, compositions, processes, research and

-1-

development, cost information, financial information, marketing and/or sales plans or proposals, contracts, employee names and referral sources.

1.2 **"CRS"** means Credit Repair Services, which are generally defined as the offer and provision of services that improve or are intended to improve the credit rating of an individual on their credit reporting agency credit reports.

1.3 **"Documentation"** means the documentation specified in the Product Schedule(s), attached hereto, together with all additions, changes and updates furnished by VENDOR under paragraph 4.3 or otherwise under this Agreement.

1.4 **"Product"** means the computer programs specified in the Product Schedule(s) together with any and all corrections and updates furnished by VENDOR to CUSTOMER under paragraphs 4.3, 6.2, 6.4 or otherwise under this Agreement.

1.5 **"Trade Names"** means "The Lexington Law Firm."

1.6 **"Use Area"** means the United States of America, subject the to limitations on Restricted Advertising set forth herein.

1.7 **"Restricted Advertising"** means any advertising method or market that the VENDOR has indicated in writing to CUSTOMER may not be used or advertised in connection with respect to the use of the Products or services provided pursuant to this Agreement. VENDOR shall notify CUSTOMER of such limitations from time to time by written notice to CUSTOMER.

2. **Product Delivery and Software License.**

2.1 **Deliverables.** Upon execution of this Agreement, VENDOR shall deliver to CUSTOMER one reproducible master copy of the Product, in object code form and one copy of the User Documentation and Administration Documentation, in electronic form.

2.2 **Grant.** VENDOR hereby grants CUSTOMER a personal, nonexclusive, nontransferable license to:

2.2.1 Reproduce, install and use the Product for internal processing requirements of CUSTOMER, on the number of CUSTOMER'S computers then authorized under this Agreement. The number of computers authorized initially shall be fifty (50) computers. CUSTOMER may increase the number of authorized computers from time to time in the unit quantities and upon payment to VENDOR of the applicable amount as set forth in the Product Schedule(s). CUSTOMER shall keep accurate records of the reproduction and location of each copy of software and, upon request, provide VENDOR with complete access to such records and to CUSTOMER'S facilities, computers and the Product to audit and verify

-2-

CUSTOMER'S compliance with this Agreement. Within 30 days of the end of each calendar quarter (March 31, June 30, September 30, and December 31) CUSTOMER shall provide VENDOR with a report of the number of CUSTOMER computers, including servers, installed as of the end of such calendar quarter.

    2.2.2 Reproduce the Documentation and/or incorporate all or any portion of the Documentation in documentation and training materials prepared by CUSTOMER, in each case solely for internal use by CUSTOMER and provided that the copyright notices and other proprietary legends of VENDOR are included on each copy of the Documentation and such materials.

    2.2.3 Reproduce and make one copy of the Product for archival and backup purposes.

    2.3 **Use.** CUSTOMER shall use the Product and the Documentation only for the purposes specified in paragraph 2.2 and in accordance with the following:

    2.3.1 CUSTOMER shall use the Product only on the then authorized number of computers which are owned or used by CUSTOMER and will use the Product and Documentation solely for CUSTOMER'S internal use.

    2.3.2 CUSTOMER shall not modify or prepare derivative works from the Product or Documentation except as expressly permitted in paragraph 2.2.

    2.3.3 CUSTOMER shall not reverse engineer, disassemble or de-compile the Product.

    2.3.4 CUSTOMER shall not remove, obscure, or alter any notice of patent, copyright, trade secret, trademark, or other proprietary right present on any Product or Documentation; CUSTOMER shall not sublicense, sell, lend, rent, lease, or otherwise transfer all or any portion of the Product or the Documentation to any third party except as permitted in paragraph 9.4.

    -2.3.6 CUSTOMER shall not use the Product or the Document to provide CRS to clients obtained through Restricted Advertising.

    **2.4 Protection Against Unauthorized Use.** CUSTOMER shall promptly notify VENDOR of any unauthorized use of the Product or Documentation that comes to CUSTOMER'S attention. In the event of any unauthorized use by any of CUSTOMER'S employees, agents or representatives, CUSTOMER shall take all actions legally available to it to terminate such unauthorized use and to retrieve any copy of the Product or Documentation in the possession or control of the person or entity engaging in such unauthorized use. CUSTOMER shall immediately notify VENDOR of any legal proceeding initiated by CUSTOMER in

ORV052

connection with such unauthorized use. VENDOR may, at its option and expense, participate in any such proceeding and, in such event, CUSTOMER shall provide such authority, information and assistance related to such proceeding as VENDOR may reasonably request to protect VENDOR'S interests.

2.5     **Reservation of Proprietary Rights.** The Product and Documentation involve valuable copyright, trade secret, trademark and other proprietary rights of VENDOR. Except for the license granted under paragraph 2.2, VENDOR reserves all rights to the Product and Documentation. No title to or ownership of any Product or proprietary rights related to the Products or Documentation is transferred to CUSTOMER under this Agreement.

3.      **Tradename License.**

3.1     **Right to Use.** VENDOR does hereby give and grant unto CUSTOMER, subject to the provisions hereinafter set forth, an exclusive license, right, and permission, in the United States ("the Use Area"), to use the Trade Names in connection with its marketing and other business purposes. This license, right, and permission is limited to the sole purpose of allowing CUSTOMER to use the Trade Names as a part of its business name and the conduct of its business and shall not operate to grant any other rights whatsoever. In connection with the use of the Trade Names, CUSTOMER shall not represent that it has any ownership in the Trade Names or registrations thereof. CUSTOMER acknowledges that CUSTOMER's use of the Trade Names shall inure to the benefit of VENDOR upon termination of this Agreement. At no time shall CUSTOMER adopt or use, without VENDOR's prior written consent, any name, word, or mark that is similar to or likely to be confused with the Trade Names or any associated mark.

3.2     **Consent.** In order to allow CUSTOMER to use the Trade Names, VENDOR agrees that it shall cause to be executed such "consents to use similar name" as are presently or in the future required by any governmental entity in connection with CUSTOMER's use of the Trade Names pursuant to the terms of this Agreement.

4.      **Maintenance and Support.**

4.1     **Software Updates.** VENDOR will furnish to CUSTOMER within a reasonable time after publication (a) one (1) copy of any corrections, or updates to the Product, in object form, which is published and generally made commercially available by VENDOR during the applicable 12-month period referred to as the "Annual Maintenance Period" and (b) any and all corrections and updates to the Documentation made commercially available by VENDOR.

4.2     **Limitations.** The Updates will not include any upgrade or new version of the Products that VENDOR decides, in its sole discretion, to make generally available as a

-4-

separately priced item. This Section will not be interpreted to require VENDOR to (i) develop and release enhancements or (ii) customize any enhancements to satisfy CUSTOMER's particular requirements. If an enhancement replaces the prior version of the Product, CUSTOMER will destroy such prior version upon installing the enhancement.

    4.5    Fees. For VENDOR Maintenance and Support as described in <u>paragraphs 4.1, 4.2, and 4.3</u>, CUSTOMER agrees to pay VENDOR the Annual Maintenance and Support Fee in the amount and at the time described in paragraph 8.1. The Maintenance and Support described in <u>paragraphs 4.1, 4.2, and 4.3</u> may be renewed by CUSTOMER thereafter on an annual basis by payment of the Annual Maintenance and Support Fee at the beginning of the new Annual Maintenance Period. VENDOR reserves the right to change the Annual Maintenance and Support Fee from time to time effective at the commencement of the next Annual Maintenance Period by giving CUSTOMER at least sixty (60) days' prior written notice of such change. VENDOR reserves the right to charge CUSTOMER a reinstatement fee to resume maintenance and support if CUSTOMER has not continuously maintained such services in effect. VENDOR reserves the right to change or discontinue from time to time all or any part of the services or systems described in this <u>Section 4</u>.

    4.6    **Management and Training.** Provided that CUSTOMER has contracted for maintenance and support services and is current with maintenance and support fees, VENDOR will provide up to four (4) hours per month of management and training for CUSTOMER'S administrators, trainers and/or employees with respect to the operational aspects of the Products at CUSTOMER's request. VENDOR shall also provide such further management and training as VENDOR shall direct with respect to the use of the Product for the purposes of providing CRS. Because of VENDOR's experience in the CRS area, VENDOR may make suggestions to CUSTOMER with respect to the implementation of the Product or its use for purposes of providing CRS; provided, however, CUSTOMER shall have sole discretion as to any such implementation decisions and shall direct VENDOR accordingly. Upon the request of the CUSTOMER, VENDOR shall provide additional training in excess of the monthly amount specified above consistent with the foregoing; provided, such additional training shall be billed to CUSTOMER at VENDOR'S then applicable standard training rates and charges

    4.7  -    **Additional Consulting Services.** VENDOR shall provide additional consulting services to CUSTOMER with respect to the utilization of the Products in CUSTOMER's provision of CRS to its clients. All such consulting services shall be charged to CUSTOMER at VENDOR's then applicable consulting rates and charges. On occasion, CUSTOMER may utilize the services of third-party consultants in connection with satisfying CUSTOMER's requests for consulting services. Such services shall be, at the sole discretion of VENDOR, billed directly to CUSTOMER by the said third-party-consultants or included in VENDOR's bill to CUSTOMER with respect to consulting services.

-5-

5.  **Termination.**

    5.1  **Term.** The term of this Agreement and the licenses set forth herein shall commence on the date of this Agreement and shall end upon the termination of this Agreement pursuant to paragraph 5.2 or 5.3.

    5.2  **Termination By CUSTOMER.** CUSTOMER may terminate this Agreement and the licenses granted herein by giving thirty (30) days written notice to VENDOR. Any and all outstanding fees due must be paid commensurate with such notice of termination.

    5.3  **Termination By VENDOR.** , VENDOR may terminate this Agreement and the licenses granted herein by giving thirty (30) days written notice to CUSTOMER.

    5.4  **Post Termination.** Upon termination of this Agreement by VENDOR, CUSTOMER shall promptly cease use of the Product and Documentation and destroy (and in writing certify such destruction) or return to VENDOR all copies of the Product and Documentation then in CUSTOMER'S possession or control. CUSTOMER further agrees that upon the termination of this Agreement for any reason whatsoever, CUSTOMER shall within thirty (30) days do the following: (a) discontinue the use of the Trade Names in its business name or in any other way; (b)cease and desist from any and all use of the Trade Names and any associated marks whatsoever; and (c) cease and desist from any and all use of any of the intellectual properties, strategies, methods, contacts, etc. as listed in the Operational Services Inventory attached hereto.

    5.5  **Survival.** All provisions of this Agreement, which may reasonably be interpreted or construed as surviving the termination of this Agreement, shall survive the termination of this Agreement.

6.  **VENDOR Disclosures and Disclaimers.**

    6.1  **Other Clients.** CUSTOMER acknowledges that the licenses granted hereunder are non-exclusive and that VENDOR does now and will continue to market the Products or products substantially similar thereto to various individuals and entities, and that VENDOR provides training, management and consulting services to such individuals and entities. This Agreement shall not be deemed to in any way impair or limit VENDOR's ability to grant such licenses or provide such training, management and consulting services.

    6.2  **Advances and Product Enhancements.** All advances or other enhancements in the Products or the processes and procedures employed by VENDOR in its training, product, management and consulting services made by reason of VENDOR's performance of this Agreement or any advances derived from the provision of the management, training or consulting services are proprietary in nature and shall accrue to the benefit of VENDOR and may be shared with such other individuals or entities as are clients of VENDOR.

-6-

VENDOR shall be free to employ any and all such advances in the further development of the Product or in connection with the provision of training, management and consulting services provided to other customers of VENDOR. This Agreement shall not be deemed in any way to impair or otherwise limit VENDOR's ability to grant such licenses or provide such training, management and consulting services. Notwithstanding the foregoing, VENDOR shall not disclose any confidential information regarding CUSTOMER'S clientele obtained by VENDOR pursuant to its performance of its obligations under this Agreement.

      6.3    **Disclaimer--CUSTOMER Representations, Covenants and Indemnifications.** VENDOR IS NOT LICENSED TO PRACTICE LAW AND MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO THE PRODUCTS OR THAT ANY SERVICES RENDERED HEREUNDER ARE IN COMPLIANCE WITH STATE OR FEDERAL LAW GOVERNING CREDIT REPAIR SERVICES OR SIMILAR SERVICES. CUSTOMER is solely responsible for CUSTOMER's use of the Product for the performance of credit repair services for its clients and will save, indemnify, defend and hold harmless VENDOR from and against any claim or liability arising by reason of CUSTOMER's use of the Product for CRS. CUSTOMER is solely responsible to supervise and control its employees with respect to the use of the Product for the purposes of providing legal services as required, or may be required, by any professional standards or rules of professional conduct that are applicable to CUSTOMER. CUSTOMER further represents and warrants to VENDOR that to the best of its knowledge, after due inquiry, that the use of the Products in CUSTOMER's practice and the performance of either party to this Agreement as set forth herein is not in violation of any such standards or rules. CUSTOMER covenants that it shall put into practice such rules governing use of the Product as CUSTOMER reasonably deems necessary to ensure proper supervision of its non-attorney employees and the maintenance of its independent professional judgment.

      6.5    **WAIVER AND RELEASE.** CUSTOMER HEREBY WAIVES, RELEASES AND DISCLAIMS, ALL WARRANTIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO THE PRODUCTS, DOCUMENTATION, SERVICES AND ANY OTHER ITEMS SUBJECT TO THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO: (A) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; (B) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE; (C) ANY OBLIGATION, LIABILITY, RIGHT, REMEDY, OR CLAIM IN TORT, NOTWITHSTANDING ANY FAULT, NEGLIGENCE, STRICT LIABILITY OR PRODUCT LIABILITY OF VENDOR (WHETHER ACTIVE, PASSIVE OR IMPUTED); AND (D) ANY OBLIGATION, LIABILITY, REMEDY, RIGHT OR CLAIM FOR INFRINGEMENT.

ORV056

7. Limitations of Liability.

    7.1 **Excused Performance.** Neither party will be liable for, or be considered to be in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement (other than monetary obligations) as a result of any cause or condition beyond such party's reasonable control.

    7.2 **DOLLAR LIMITATION.** VENDOR'S LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT OR OTHERWISE; AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE, REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY OF VENDOR) UNDER THIS AGREEMENT (EXCEPT FOR VENDOR'S OBLIGATIONS UNDER PARAGRAPH 6.3) WITH REGARD TO ANY PRODUCT, DOCUMENTATION, SERVICES OR OTHER ITEMS SUBJECT TO THIS AGREEMENT SHALL IN NO EVENT EXCEED THE TOTAL COMPENSATION PAID BY CUSTOMER TO VENDOR UNDER THIS AGREEMENT FOR THE LAST FULL MONTH IMMEDIATELY PRIOR TO THE TERMINATION OF THIS AGREEMENT.

    7.3 **DAMAGE LIMITATION.** IN NO EVENT WILL VENDOR HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHER CAUSE OF ACTION) FOR THE COST OF COVER OR FOR ANY INCIDENTAL, DIRECT, INDIRECT OR CONSEQUENTIAL DAMAGES OR LIABILITIES (INCLUDING, BUT NOT LIMITED TO, ANY LOSS OF REVENUE, PROFIT OR BUSINESS) EVEN IF VENDOR OR ITS EMPLOYEES AND REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8. Payment.

    8.1 **Licensing Fees.** CUSTOMER will pay to VENDOR the Product License Fee and the Trade Names License Fee on the dates and in the amount specified herein within five (5) days after CUSTOMER'S receipt of VENDOR'S invoice. All amounts set forth herein are subject to increase upon notice from VENDOR in the event the CUSTOMER's use of the Products grows significantly. The Product License Fee shall be set, initially, at $5,083.00 per month. The Trade Names License Fee shall be set, initially, at $5,083.00 per month.

    8.2 **Training and Mangement Fees.** Hourly fees for training and management services provided over and above the hourly requirements specified in Paragraph 4.6 shall be billed on a monthly basis and shall be paid by CUSTOMER within five (5) days after CUSTOMER's receipt of VENDOR's invoice therefore.

ORV057

        8.3    **Consulting Fees.** Hourly fees for consulting services provided hereunder shall be billed on a monthly basis and shall be paid by CUSTOMER within five (5) days after CUSTOMER's receipt of VENDOR's invoice therefore.

        8.4    **Other Royalty Fees.** Other Royalty Fees for use of intellectual properties provided hereunder, in addition to Licensing Fees, shall be billed on a monthly basis and shall be paid by CUSTOMER within five (5) days after CUSTOMER's receipt of VENDOR's invoice therefore. The amount of the Royalty Fee shall be reviewed and reassessed each quarter of the year, at the end of each quarter of the year, and shall increase or decrease depending on the volume of use of the intellectual properties described herein. Royalty Fees shall not initially be paid, but shall be reviewed and assessed on a quarterly basis.

        8.5    **Fee Miscellaneous.** All monetary amounts shall be paid in lawful currency of the United States of America. Unless otherwise specified, the license fees, charges and other amounts specified in this Agreement do not include any sales, use, excise or other applicable taxes (excluding any applicable federal and state taxes based on VENDOR'S net income). CUSTOMER will pay or reimburse VENDOR for any and all such taxes. Any amount not paid when due will bear interest at the rate of one and one-half percent (1.5%) per month, determined and compounded on a daily basis from the date due until the date paid. CUSTOMER will pay such interest when remitting the principal amount to VENDOR. CUSTOMER shall pay all amounts due under this Agreement to VENDOR at the address indicated at the beginning of this Agreement or such other location as VENDOR designated in writing. CUSTOMER agrees to provide VENDOR an accurate and complete statement of all vital statistics of VENDOR at the end of each month including client volume, revenues and profit and so forth qso that VENDOR may asses the volume use of the Product.

9.    **Miscellaneous.**

        9.1    **Confidential Information.** CUSTOMER agrees that, in consideration for VENDOR's allowing CUSTOMER access to the Products and the provision of services required hereunder by VENDOR, that the CUSTOMER shall hold such Confidential Information in confidence and take all measures necessary to prevent Confidential Information from falling into the public domain or into the possession of persons not bound to maintain the confidentiality of Confidential Information, and shall not disclose it without VENDOR's prior written consent to any person, firm or corporation, or to the public, or in any way whatsoever to parties other than its employees or to contractors who have agreed in writing to preserve the confidentiality of the Confidential Information, nor use the Confidential Information for any purpose other than to fulfill the purposes of this Agreement and the provision of CRS to CUSTOMER's clients. The CUSTOMER agrees to treat the Confidential Information as confidential and proprietary to VENDOR. The CUSTOMER shall protect the Confidential

-9-

9.7 **Compliance With Laws.** VENDOR and CUSTOMER shall each comply with all applicable laws, regulations, rules, orders and other requirements, now or hereafter in effect, of any applicable governmental authority, in their performance of this Agreement.

9.8 **Governing Law.** THIS AGREEMENT WILL BE INTERPRETED, CONSTRUED AND ENFORCED IN ALL RESPECTS IN ACCORDANCE WITH THE LAWS OF THE STATE OF UTAH WITHOUT REFERENCE TO ITS CHOICE OF LAW RULES. CUSTOMER WILL NOT COMMENCE OR PROSECUTE ANY CLAIM, ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT OR THE PRODUCT, DOCUMENTATION, SERVICES OR OTHER ITEMS SUBJECT TO THIS AGREEMENT OTHER THAN IN THE COURTS OF THE STATE OF UTAH, SALT LAKE COUNTY, OR THE UNITED STATES DISTRICT COURT LOCATED IN SALT LAKE COUNTY. CUSTOMER HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION AND VENUE OF THE COURTS IDENTIFIED IN THE PRECEDING SENTENCE IN CONNECTION WITH ANY CLAIM, ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY PRODUCT, DOCUMENTATION, SERVICES OR OTHER ITEMS SUBJECT TO THIS AGREEMENT.

| VENDOR | CUSTOMER |
|---|---|
| Signature: _____ | Signature: _____ |
| Printed Name: JAYSON ORVIS | Printed Name: _____ |
| Title: MANAGER | Title: _____ |
| Date Signed: 5-1-01 | Date Signed: May 1, 2001 |

IN WITNESS WHEREOF the parties have executed this Agreement on May 1st, 2001.

-11-

ORV060

Operational Services Inventory
Attachment

AuditPro Software (Filemaker Pro)
Import pro (Filemaker Pro)
Mail it plug ins (filemaker Pro)
SMTP-IT / POP-IT (Filemaker Pro)
Mondo Mail plug-in (Filemaker Pro)
Payment repost for Credit Cards (Filemaker Pro and plug-ins)
Payment repost for ACH (Filemaker Pro and plug-ins)
Re-dispute engine (Filemaker Pro)
Disputer Engine Software (Filemaker Pro)

-12-

ORV061

## ASSIGNMENT

ASSIGNMENT made this 12th day of January, 2001, by Jamis M. Johnson to Jayson Orvis/Attorneys for People, LLC., a Utah limited liability company, as follows:

WHEREAS, the name Lexington Law Firm is a duly registered assumed name and/or d.b.a. of Jamis M. Johnson with the State of Utah, and constitutes a valid trade name having been used extensively in the business of credit repair, and

WHEREAS, the said trade name is an asset actually owned jointly by Jamis M. Johnson and Jayson Orvis, and

WHEREAS, Jamis M. Johnson and Jayson Orvis own intellectual property and tangible and intangible assets for the business of credit repair and per prior agreement, this trade name is to be assigned by Jamis M. Johnson to Jayson Orvis, and

WHEREAS, Jayson Orvis has established a limited liability company called Attorneys for People, LLC., of which he is the only member, and which he was to hold some of these joint assets and through which he administrates some of the credit repair business, and

WHEREAS, Jamis M. Johnson desires to assign the trade name to Jayson Orvis/Attorneys for People and it shall form and is part of the assets jointly owned by Johnson and Orvis and administrated by Orvis;

NOW THEREFORE, based upon the foregoing recitals and upon the prior agreement of the parties,

Jamis M. Johnson does hereby assign to Jayson Orvis/Attorneys for People, LLC., the trade name/assumed name Lexington Law Firm.

Johnson agrees that the name may reside in his name on the files of the State of Utah, if Orvis so desires.

DATED on the date first above written.

_____
Jamis M. Johnson

State of Utah      )
                   :ss
County of Salt Lake )

On this 12th day of January, 2001, personally appeared before me, Jamis M. Johnson, the signer of the foregoing ASSIGNMENT, who duly acknowledged to me that he executed the same.

NOTARY PUBLIC
KIM A. RENAK
220 SOUTH 200 EAST STE. 110
SALT LAKE CITY, UT 84111
MY COMMISSION EXPIRES
SEPTEMBER 26TH, 2004
STATE OF UTAH

_____
Kim A. Renak