UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHELLE GOKTEPE

v.   CASE NO. 3:03CV 0089 (MRK)

VICTOR LAWRENCE d/b/a/ LEXINGTON LAW FIRM   January 10, 2005

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL

| | |
|---|---|
| Nature of the Case | page 1 |
| Background of the CROA | 2 |
| Discovery Principles | 3 |
| No Objection, No Response | 4 |
| Confidentiality Objections | 6 |
| Confidentiality plus other objections | 6 |
|     Relevance | 7 |
|     Burdensome | 9 |
| Fourth Request for Production (Sept. 17, 2004) | 11 |
| Further Depositions | 13 |
| Sufficiency of Response to Nov. 19 Admission Requests | 14 |

Exhibits:
   Plaintiff's Complaint <u>Annotated</u> with Denials, Defenses
   Defendant's discovery responses
   Excerpt from Affidavit of Jamis Johnson
   Johnson & Associates Board Resolution (1999)
   Lexington Profit Sharing Notes (1997)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHELLE GOKTEPE

v.                                                    CASE NO. 3:03CV 0089 (MRK)

VICTOR LAWRENCE d/b/a/ LEXINGTON LAW FIRM                January 10, 2005

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL

Nature of the Case

This case was filed two years ago, in January 2003. In October 2002, Ms. Goktepe signed up at an interactive internet site for defendant's services to correct her credit report, based on representations, inter alia, that defendant would provide legal services as a law firm, and on its published statistics touting the ability to remove adverse entries. She simply wanted her husband's bankruptcy off her credit report. Defendant did not address the bankruptcy issue, but instead sent the credit bureaus embarrassingly childish letters over her signature, claiming that her own accounts (which incorrectly included her husband's bankruptcy) were not hers at all. She realized that she had been deceived when one of the letters, because it was misaddressed, was returned to her. Per federal notice pleading, plaintiff alleged that defendant violated the Credit Repair Organizations Act (CROA), *inter alia*, 15 U.S.C. § 1679b(a)(1) by making untrue or misleading statements to a consumer reporting agency; §1679b(a)(3) by misrepresenting its services; and §1679b(a)(4) by engaging in acts, practices or courses of business which constitute or result in the commission of a deception on its customers, plaintiff or the consumer reporting agencies; §1679b(b) by charging and receiving money for the performance of its agreement before the service was fully performed; and §1679d(b) by failure to include the information required by that subsection.

Background of the CROA

Credit repair clinics are the bane of both consumers and the credit reporting agencies; they overwhelm the credit bureaus with "disputes" so that the bureaus are unable to recognize and respond to legitimate disputes. The FTC, the BBB, the AARP and nearly all state attorneys general warn consumers against credit repair clinics. According to Connecticut Attorney General Richard Blumenthal, "Credit repair scams literally kick consumers when they are down, fostering and exploiting false hopes of building a better credit history after suffering through tough times financially." http://www.ftc.gov/opa/1998/03/eraser.htm. "These companies promised the impossible -- to make accurate financial information miraculously disappear," Blumenthal said. "Charging for this credit black magic combines insult and injury." http://www.cslib.org/attygenl/press/1996/repair6.htm.[1]

> Enter the credit repair clinic. Congress had recognized the abuses by many of the newly emerging credit repair clinics well before it finally enacted the CRO Act in 1996. In 1988, Representative Frank Annunzio described these businesses as "kin to `get rich quick' schemes. They promise fast results and new-found wealth in the form of available credit."

FTC v. Gill, 265 F.3d 944, 949 (9th Cir. 2001) (sanctions against lawyer operating credit repair clinic in violation of Credit Repair Organizations Act ("CROA").

> As Americans' reliance on credit has increased, so-called "credit repair clinics" have emerged, preying on individuals desperate to improve their credit records. These organizations typically promise they can have any negative information removed permanently from any credit report . . . for a fee. On September 30, 1996, Congress enacted the Credit Repair Organizations Act ("CRO Act"), 15 U.S.C. §§ 1679-1679j, to ensure that the clinics provide potential customers with the

---

[1] One of the defendants in Operation Payback was Lexington Law Firm. Yet Lexington does not yet comply with its own consent order, and claims it need not do so. http://www.ftc.gov/opa/1996/04/credlst.htm.

>information needed to decide whether to employ the services of such an organization and "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b).

Id. at 947. Lawrence, d/b/a Lexington, operated uncannily like Gill.

The CROA is a "private attorney general" statute; like most other titles of the Consumer Credit Protection Act, its aim is to encourage private enforcement by awarding attorney's fees to the consumer. Compare Graziano v. Harrison, 950 F.2d 107, 113-14 (3d Cir. 1991) (FDCPA "mandates an award of attorney's fees as a means of fulfilling Congress's intent that the Act should be enforced by debtors acting as private attorneys general").

Discovery principles

Because the CROA allows plaintiff to seek relief based on defendant's engaging in acts, practices or courses of business which constitute or result in the commission of a deception on its customers, discovery is not limited to precisely what happened to plaintiff. She is permitted discovery on the course of conduct. Indeed, to get punitive damages, she must show the frequency or persistence of noncompliance, the nature of the noncompliance, and the extent to which such noncompliance was intentional. These factors transcend the events to which defendant would like to limit discovery.

It is the defendant's burden to persuade the Court that the information he has refused to provide is outside the broad scope of discovery. Compagnie Francaise D'Assurance v. Phillips Petroleum, 105 F.R.D. 16 (S.D.N.Y. 1984); White v. Beloginis, 53 F.R.D. 480 (S.D.N.Y. 1971); Elgin FCU v. Carter, Fitzgerald Securities, 91 F.R.D. 414 (N.D.Ga. 1981); US v. 58.16 Acres of Land, 66 F.R.D. 570 (1975).

3

"Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception in which the person who hides the ball most effectively wins the case." Abrahamsen v. Trans-State Express, 92 F.3d 425, 428-29 (6th Cir. 1996). "A primary purpose of discovery is to enhance the reliability of the fact-finding process by eliminating distortions attributable to gamesmanship." Traxler v. Ford Motor Co., 576 N.W.2d 398, 409 n.1 (Mich. App. 1998).

NO OBJECTION, NO RESPONSE

Defendant neither responded nor objected to parts of the Third Discovery Request (July 19, 2004). He evidently intended to respond to the following, but has not:

> 3. Identify any person or entity (affiliate program described at LLF 0236 ff.)[2] to whom payment was made due to plaintiff's entry into a retainer after visiting a referring website.
>
> 4. What is the meaning of E2 (D&M) listed at LLF 0050?

Prod. 1. All portions of any videotape and/or audio recording of the FCRA conference attended by defendant in Orlando FL.[3]

Second production request dated April 20, 2004:

2. Provide an authenticated copy of the pages of the Lexington Law web site (as Mr. Atkin represented he would do on November 18, 2003), preferably as it existed when plaintiff entered into her retainer agreement or as close thereto as possible.

Defendant agreed to permit inspection at Atkin & Shields in Utah. Plaintiff had to pay for local counsel to make a copy and forward it. However, the web site material was dated July, 2004, not September or October, 2002. In response to Third Admissions, defendant admitted that Utah Ethics Opinion 97-10 requires that attorneys must keep copies of their advertising materials for

---

[2] LLF is the numbering system on defendant's production material.

two (2) years after it is published pursuant to Rule 7.2 of the Utah Rules of Professional Conduct" and Denied that 'Defendant did not keep a copy of each of Lexington Law's web pages for September or October 2002."

Accordingly, plaintiff requests an Order that defendant produce the material: *the web pages as of September or October 2002, based on which plaintiff signed up.*

<u>Fifth</u> production request, Nov. 23, 2004:

1. All documents you signed during 2004 concerning or arising out of Lexington Law Firm, including any and all assignments, agreements with or signed by Jayson Orvis, John Heath, or Lexington Law.
2. All documents you received during 2004 concerning or arising out of Lexington Law Firm, including any and all checks, payment instruments, assignments, and agreements signed by Jayson Orvis, John Heath, or Lexington Law.

The undersigned has no record or recollection of receiving any responses or objections to the two requests. According to a recent deposition in another matter, Mr. Lawrence ceased being part of Lexington Law on June 23, 2004 and retired from the practice of law; according to Mr. Lawrence's July 8, 2004 deposition, he owned Lexington Law. When Jamis Johnson was ousted from Lexington, and Mr. Lawrence took his place, there were documents confirming one Jayson Orvis's ownership and profit sharing. See Documents Appended to Mem. in Support of Motion to Strike Appearance, Doc. No. 100. If this defendant has been ousted, there are no doubt similar documents showing the continuation of the operation on the same profit sharing, licensing, and ownership terms as existed well before Ms. Goktepe signed up.

---

3 Defendant claimed, at his July deposition, that he had such an item, and that he would provide it.  P. 152-53.

5

CONFIDENTIALITY OBJECTIONS.

The objection to most of the requests was confidentiality. Now that the confidentiality Order has entered, defendant should provide the information to which confidentiality was the sole objection:

> Production 4: All manuals, procedures, and protocols used by defendant to comply with the Credit Repair Organizations Act.
>
> The original response (June 20, 2003) objected solely on the ground "that it seeks information that is confidential commercial property belonging to Lexington." In defendant's Supplemental Response dated Jan 9, 2003, defendant claimed that he "will produce, upon entry of an appropriate protective order, those portions of its manuals, procedures and protocol, relating to defendant's policy to not collect money until after services are fully performed and relating to defendant's policy of not promising specific results.

Plaintiff seeks an Order compelling a full response, not a self-selected response to the limited areas defendant agreed to provide. Plaintiff does not anticipate that the procedures and protocols changed much over the years since 1991, when he claims Lexington began its operations, but even the changes will show defendant's continuing efforts to comply with the CROA, since he claims to be in compliance therewith. At the latest, the time frame should begin around September 1996 when the CROA was enacted. Plaintiff can show a pattern, practice, or course of conduct based on activity outside the statute of limitations. Sir Speedy, Inc. v. L. & P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992).

CONFIDENTIALITY PLUS OTHER OBJECTIONS

Defendant asserted pro forma objections to some requests in addition to confidentiality, and refused to provide the "confidential" material because of these conclusory, unexplained objections. The objections are variations of "not calculated to lead to admissible evidence",

"vague and ambiguous"; "overly broad and unduly burdensome."

Fed. R. Civ. P. 33(b)(4) states that "all grounds for an objection to an interrogatory shall be stated with specificity." An objection to be adequate must provide enough information so that the court (and the opposing party) can evaluate the objection without resort to extrinsic information. *See* <u>Panola Land Buyers' Association v. Sherman</u>, 762 F.2d 1550 (11th Cir. 1985); <u>Davis v. Fendler</u>, 650 F.2d 1154 (9th Cir. 1981); <u>Peat, Marwick, Mitchell & Co. v. West</u>, 748 F.2d 540 (10th Cir. 1984). Reciting "magic words" is not specificity.

Boilerplate, unsubstantiated objections are invalid. "[T]he mere statement by a party that [an] interrogatory was overly broad, burdensome, oppressive and irrelevant is not adequate to voice a successful objection to an interrogatory." <u>Josephs v. Harris Corp</u>., 677 F.2d 985, 992 (3d Cir. 1982); <u>Obiajulu v. City of Rochester</u>, 166 F.R.D. 293, 295 (W.D.N.Y. 1966) (boilerplate objections inconsistent with federal rules); <u>Burus v. Imagine Films Entertainment, Inc</u>., 164 F.R.D. 589, 593-94 (W.D.N.Y. 1966) (blanket objections are insufficient).

<u>RELEVANCE</u>

From the May 2003 interrogatories:

    4. Set forth the number of individuals who entered into retainer arrangements with Lexington during 2002 for credit restoration.
    5. Set forth the number of individuals with a Connecticut address who entered into retainer arrangements with Lexington during 2002 for credit restoration.
    6. Set forth the number of individuals with a Connecticut address who have been Lexington's customers for credit restoration and paid Lexington for services in connection with credit restoration during and after January 2000.
    7. Identify all Affiliates who agreed to participate in Lexington's affiliate network.
    8. Identify Lexington's affiliate network manager during 2002.

From the May 2003 Production requests:

7

    8. All documents showing incorporation, licensing or trade name status for each business in which the defendant engages. [Supplemental response promises to provide defendant's business license and dba registration, but that has not been done]
    9. All balance sheets, income and expense statements, 1099's and corporate tax returns relating to credit restoration income and expenses for the past three years.
    10. All agreements with affiliates who have signed up for the Affiliate program ("exciting opportunities to earn income through your web site").
    11. All form letters and manuals used by credit repair staff for entry of data and information from consumer clients.
    12. All form letters and manuals used by credit repair staff for communication with credit bureaus.
    13. All forms and manuals used by credit repair staff for entering and maintaining the statistical information as to success rates which appear on your web site.

In addition to confidentiality, the only objection was "neither relevant nor likely to lead to the discovery of admissible evidence." Defendant has denied that this Court has jurisdiction and has denied that it is a credit repair organization. Further, the Affiliates (paid for referrals to Lexington) made some representations about Lexington's "credit repair" services that Lexington undoubtedly endorsed. Plaintiff intended to follow up the affiliate questions by discovery to the affiliates. Plaintiff is confident that the financial information sought in Interrogatory 9 will show that defendant acted merely as a figurehead for the laypersons who actually profit from the venture –Jayson Orvis, Deon Steckling, and others –just as in <u>FTC v. Gill</u>. Finally, it is defendant's burden to substantiate the objections. Some defendants interpose boilerplate objections just to "see what will stick" and rather than seek plaintiff's work product and get enough knowledge to enable defendant to evade the thrust of the requests.

From the April 2004 interrogatories and production:

    3. Identify each licensor of intellectual property and technology to defendant / Lexington Law concerning its credit repair operations, and describe what products, personnel or services each provides.
    7. Identify the person who is hired to perform internet services for Lexington Law.
From the April 2004 Production requests:

8

1. All agreements pursuant to which defendant contends that he is bound to the confidentiality of any product or service he licenses concerning the credit repair business.

In addition to confidentiality, the objection were "trade secret"(subsumed within confidentiality) and "not likely to lead to the discovery of admissible evidence"(relevance) Defendant has contended that he licensed every aspect of the "Lexington Law" business from third parties (believed to be companies owned by Jayson Orvis and Deon Steckling, among others). Third party documents that show whether defendant engaged in acts, practices or courses of business which constitute or result in the commission of a deception on its customers, plaintiff or the consumer reporting agencies are directly relevant.

BURDENSOME

From the July 2004 discovery requests:

Interrogatory 1: Provide the name and address of all your Connecticut clients during the last quarter of 2002.

Interrogatory 2: Provide the number of disputes which did not result in removal of a disputed item from a credit report during 2003.[4]

Interrogatory 5: Set forth the average number of letters to credit bureaus sent by Lexington weekly during the last quarter of 2002, or any recent quarter.

Production 2. Copies of any 2002 or 2003 quarterly statistical report as to numbers of credit bureau disputes processed by defendant.

Defendant objects to the request on the grounds that it seeks confidential commercial information, is overly broad and unduly burdensome, is not calculated to lead to admissible evidence and instead is designed to harass defendant.

Defendant's success rates, touted on the internet, can be compared with the numbers of disputes processed to show misrepresentation about success rates (by omission), or at least to

---

[4] There was no confidentiality objection to this request; just "vague and ambiguous," "overly broad and unduly burdensome," and "not calculated to lead to admissible evidence." It is discussed here because the production

show that defendant is in the business of credit repair. Defendant said, at his July deposition, that he had the information:

```
p. 195 line 13: What I do is this, when I send out my
14   disputes, whether it's an attorney sending it out,
15   whether it's a bureau dispute letter signed in the
16   client's name on the client's behalf, the results that I
17   get back, I put the information back in my database.  I
18   can show you how many deletions I requested to be deleted
19   that were not deleted.  I can show you that.  I don't --
20   I choose not to spend time getting that.
```

Since it is all on the computer system, it is difficult to fathom how it would be burdensome to produce the information sought by Interrogatories 2, 5 and production 2. A burdensome objection "must show specifically how an interrogatory is overly broad, burdensome or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden." Chubb Integrated Systems v. Nat'l Bank of Washington, 103 F.R.D. 52, 59-60 (D.D.C. 1984). No such evidence was submitted.

     With regard to Interrogatory 1 seeking the identity of Connecticut clients, not just their numbers: The best way to tell whether what happened to plaintiff is part of a business practice, and if others were satisfied or misled, is to present witnesses. That is also the way to demonstrate that punitive damages are in order. Others' experience with defendant's practices could lead to admissible evidence about the intentional nature, frequency or persistence of its violation. Fed. R. Evid. 404(b); Hall v. Harleysville Ins. Co., 164 F.R.D. 172 (E.D. Pa. 1995). Under BMW of North America v. Gore, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996); Pulla v. Amoco Oil Company, 72 F.3d 648 (8th Cir 1996); and TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993), the plaintiff has not only a right, but a duty, to produce

---

request and interrogatory seek similar information.

evidence of any similar misconduct by the defendant. See Pulla, at 660: "We emphasize that, because Pulla failed to present any evidence that Amoco put any other individual's privacy at risk (e.g., Pulla did not suggest that the search of his credit card records stemmed from a company policy), the potential harm from the search of his credit cards can only be analyzed as the search affected him."A pattern of exploiting thousand of vulnerable consumers for small amounts is a reprehensible way to do business; it cries out for deterrence. Compare Matthias v. Accor Economy Lodging, Inc., 347 F.3d 672, 676-77 (7th Cir. 2003).

Fourth request for production (Sept. 17, 2004)

Plaintiff served her fourth production request on September 17, 2004. Belatedly, on December 17, 2004, defendant served objections to every request (26 lines or more). Essentially, the word-processing verbiage can be reduce to 'We don't want to answer because this has nothing to do with what happened to plaintiff between Sept. 25, 2002 and Nov. 18, 2002."[Defendant's ubiquitous confidentiality objection is moot.]

To the contrary, the production request is aimed at discovering who actually provided any 'services"in the light of defendant's contract with Jayson Orvis licensing virtually all aspects of Lexington Law from Orvis -- 'follow the money."See Contracts appended to Doc. No. 100. Orvis's involvement is alleged in the complaint. An attorney who licenses his law degree to a lay entity is engaging in the type of deceptive practices alleged in the complaint. Compare Avila v Rubin, 84 F.3d 222, 229 (7th Cir. 1996)

11

FOURTH REQUEST FOR PRODUCTION (verbatim)

<u>Outside service provider</u> includes any individual not directly employed by defendant and any business entity that provided services to defendant or his internet-based clientele, including the provider of any internet services, training, IT services, data services, marketing services, advertising, employment services, consultants, licensors, lessors, internet affiliates, providers of credit reports recommended by defendant such as bestcreditreports.com, truecredit.com, confidentialcredit.com.

3. All 1099-MISC or similar tax forms issued to any outside service provider for the calendar year 2002.
4. All invoices received from any outside service provider for the calendar year 2002.
5. All records showing income received from any outside service provider for the calendar year 2002.
6. All records showing payments made to any outside service provider for the calendar year 2002.
7. All records showing Lexington's income and expenses for the months of September and October 2002.
8. All documents dated 1996 or thereafter showing any agreements or assignments involving defendant, Jayson Orvis, Lexington Law, Jamis Johnson.
9. All defendant's agreements with Consumer Credit Solutions in effect in 2002.
10. All defendant's agreements with any entity managed or owned by Jayson Orvis or Deon Steckling.
11. All defendant's agreements with any outside service provider in existence during 2002.
12. All documents reflecting defendant's sources of income other than from clients of Lexington Law, and other than karate and fly fishing enterprises.
13. All documents reflecting agreements to do data entry for other companies.
14. All documents reflecting agreements to sell entered data to other companies.

The court asked for an explanation of the time frame set forth in No. 8. First, that is when the

CROA was enacted. Second, 1996 is when Lexington was in trouble with state and federal

authorities and is believed to have begun changing its structure. At that time, Lexington was

merely a marketing device, and another Orvis company [believed to be still in existence and

12

still profiting from the arrangement] actually did the credit repair. Third, 1996 is when defendant is believed to have begun his involvement. His knowledge of the structure, the profit sharing arrangements can show knowledge, ratification, and approval even if outside the statute of limitations. Sir Speedy, Inc. v. L. & P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992). Some of the background is shown in the attached documents: Affidavit of Jamis Johnson (p. 1-5); Board Resolution (1999); Jamis Johnson notes on profit-sharing (1997).

Around the time of plaintiff's enrolment, Lexington began marketing its customer data to other companies –something a law office would not do and a deceptive practice indeed in view of privacy laws. Productions 13 and 14 are limited to the arrangements in existence in and after September 2002, since plaintiff's data may have been marketed to others even after she tried to terminate her relationship.

Likewise, No. 12 can be limited to those dates. Lexington-related people have been rewarded with profit sharing participation in entities/ vendors that provide services to Lexington. See Johnson documents attached. It is likely that defendant double-dipped as well.

FURTHER DEPOSITIONS

The Court requested the parties to discuss the proposed staff depositions, continued deposition of defendant, and deposition of plaintiff's husband. Plaintiff served the September and December discovery requests in the hope of getting enough information to reduce substantially the staff depositions, which were aimed at the practices and structure of Lexington during the time frame in question, as well as the profit-sharing aspect. Since defendant did not respond to the September 17 admission requests in a timely fashion, they are deemed admitted unless defendant moves for relief. Accordingly, only two of the six staff

depositions would still be in order. The Court will recall that, over strenuous objections, it determined that 30(b)(6) staff depositions were appropriate. Tel. Conf. April 21, 2004. Despite several re-notices, defendant managed to derail them without objecting, at the last minute, every time.

The Court suggested that Mr. Lawrence review his deposition and provide the "confidential" material under oath. He has not done so as of this writing. Compliance would indeed reduce the need for a continued deposition. However, plaintiff has received much new information despite defendant's intransigence, and needs to know Mr. Lawrence's position before trial or dispositive motion, rather than face a trial by ambush due to discovery tactics.

With regard to plaintiff's husband, he is available to be deposed. However, he runs his own business – not even a "Mom 'n Pop" situation, only "Pop" – and defendant has been trying to depose him without a proper subpoena and without even paying proper witness fees, evidently on the ground that Mr. Goktepe should be a party. Upon proper subpoena and payment (to compensate for at least some of his lost productive time) we have no other objection to his deposition.

SUFFICIENCY OF RESPONSE TO NOV. 19, 2004 REQUEST FOR ADMISSIONS

At the aborted Nov. 19, 2004 deposition, Plaintiff was going to ask defendant to identify the documents appended to Doc No. 100, which bear his signature, and one other in which he is mentioned (the 1999 Johnson Board document appended hereto), since those documents show Lexington's behind-the-scenes financial arrangements with Jayson Orvis (as alleged in the complaint). Defendant denied the requests "until the Court rules" on its proposed request to release him from any obligation to respond.

1. The attached document entitled Agreement was entered into and signed by Jamis M. Johnson and Victor Lawrence on or about May 21, 1999.

2. The attached document entitled Operational Services Agreement was entered into and signed by Jayson Orvis and Victor Lawrence on behalf of Vendor and Customer on or about May 1, 2001.

3. Said Operational Services Agreement thereafter remained in effect at all times prior to February 1, 2003.

4. The attached document entitled Resolutions by Unanimous Consent was adopted by Johnson & Associates as of May 1, 1999.

Defendant solemnly and at length instructed plaintiff about her Rule 36 duties in responding to admission requests. He himself did not comply. Plaintiff requests an Order that the matters are admitted, pursuant to Fed. R. Civ. P. 36(a).

## CONCLUSION

The amount of essential discovery still awaited has prevented plaintiff from follow up discovery and from naming an expert witness in this matter. "District courts should not countenance 'purposeful sluggishness' in discovery on the part of parties or attorneys and should be prepared to impose sanctions when they encounter it." Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002). Plaintiff's Motion should be granted in all respects.

                                 THE PLAINTIFF

                                 BY___/s/ Joanne S. Faulkner_____
                                JOANNE S. FAULKNER  ct04137
                                   123 Avon Street
                                  New Haven, CT 065l1
                                    (203) 772-0395
                                    j.faulkner@snet.net

    This is to certify that the foregoing was mailed on January 7, 2005, postage prepaid, to:

Victor Lawrence d/b/a Lexington Law  
PO Box 1413  
Bountiful UT 84011-1413

                                                                             \_\_/s/ Joanne S. Faulkner\_\_\_\_  
                                                                             Joanne S. Faulkner