Joe Cartwright #7697
Attorney for Defendant
Wells Fargo Center
299 South Main Street, Suite 1700
Salt Lake City, UT 84111
Tel: 801-363-5255

## IN THE THIRD JUDICIAL DISTRICT IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| JAYSON ORVIS<br><br>   Plaintiff,<br><br>vs.<br><br>JAMIS JOHNSON<br><br>   Defendant. | AFFIDAVIT OF JAMIS JOHNSON IN SUPPORT OF MEMORANDUM OF JAMIS JOHNSON IN OPPOSITION TO JAYSON ORVIS' MOTION FOR SUMMARY JUDGMENT |
| JAMIS JOHNSON and DaNell JOHNSON,<br><br>   Third-Party Plaintiffs,<br><br>vs.<br><br>JAYSON ORVIS<br><br>   Third-Party Plaintiffs. | Civil No. 010907449<br><br>Honorable Timothy R. Hanson<br><br>(Oral Argument Requested) |

Jamis Johnson being duly sworn deposes and says as follows:

1. I am the Defendant in the captioned case and I am familiar with the facts and circumstances set forth herein. I will refer to myself below in the third person for ease in relating the below described facts.

2.. This case involves millions of dollars and It is estimated that Jayson Orvis is today personally taking $500,000 to $800,000 monthly from the credit repair ventures, one third of which belongs to the Johnsons. (Ex. 1, Vigil Deposition p70, line 6-15) (Lexington web page: lexingtonlaw.com) (Ex. 2, Deposition of Tommy Triplett p. 20, I. 9, where Orvis takes in $153,000 in one month several years ago.)

3. Lexington Law Firms has 75,000 to 150,000 clients each paying $35 monthly and Orvis takes the lion's portion of this money. (Ex. 1, Vigil Deposition *supra*.)

4. This case is an effort by Orvis to end the partnership of Orvis and the Johnsons and involves claims by the Johnsons of embezzlement, fraud and concealment by Orvis of profit share; establishment of secret companies to siphon profits from Johnsons, use of sham companies to hide from the U.S. Government the Orvis purchase of an SBA judgment; it involves the active complicity of a Utah attorney. The actual damages to Johnsons exceed several million dollars.

5. In or about 1994, Jamis Johnson, Jayson Orvis, and three others, John Hollingshead, Merrill Chandler, and Steve Paige, founded a consumer services enterprise to engage in the business of "credit repair".

6. DaNell Johnson, wife of Jamis Johnson, would hold the beneficial interest in this business venture, and she would receive monies derived therefrom, and would separately incur and pay the tax liability thereof. Jamis Johnson would

work with the venture representing their interest and interfacing with Orvis and the other partners.

7. This arrangement between DaNell and Jamis Johnson is evidenced by, among other things, Powers of Attorney dated in 1995 and 1996. (Ex. 3 Powers of Attorney) and is long-standing with similar arrangements between them extending back to as early as 1987. It is reflected in prior business ventures involving the Johnsons such as in the Caldwell Memorial Hospital business. (Ex. 4 Deposition of Jamis Johnson, March '98 page 20 line 3 and on.)

8. DaNell Johnson was to, and did, receive the profit share from this venture and Jamis Johnson would do much of the work (Ex. 3, Powers of Attorney), interface with the business, and would also incur significant personal liability.

9. The credit repair venture used many different business entities, two of which were Johnson and Associates, a Utah non profit corporation (sometimes referred to as "J&A") and Lexington Law Firms (sometime referred to as "Lexington").

10. Three of the founding partners would depart from the partnership for various reasons at different times. They were Chandler, Paige, and Hollingshead. Hollingshead left the partnership in approximately September of 1997.

11. Hollingshead's departure left Orvis and the Johnsons remaining in the partnership and conducting the credit repair business.

12. DaNell sat on the Board of J&A along with Orvis, Victor Lawrence, Sam Spendlove, etc. (Ex. 5. Resolutions By Unanimous Consent of The Board of Trustee of Johnson and Associates.)

13. Orvis ran the marketing of J&A and Lexington and an entity called eClient and provided the day-to-day management. Orvis controlled all money and

performed all accounting and financial controls, and interacted primarily with Jamis Johnson for the Johnsons (per the Power s of Attorney, and the practice and arrangement of the Johnsons).

14. Jamis Johnson was the signatory on all checks for Lexington and J&A. His computerized signature appeared on thousands of checks. The trade name Lexington Law Firms was held in his name.

15. By September of 1997, Jamis Johnson had incurred significant personal liability for the ventures, thus shielding DaNell Johnson and Orvis: The State of Tennessee had sued him under a federal regulation; (State of Tennessee vs. Jamis Johnson, U.S. District Court, Middle District of Tennessee, Civil No: 3-96-0344) The Utah Division of Consumer Affairs, , and The Utah State Bar were pursuing an administrative action relative to the credit repair business; and Johnson & Associates had incurred back tax liability placed in the name of Jamis Johnson though he was not on the Board of Trustees (Orvis and DaNell Johnson were on the Board).

16. Indeed, Orvis would acknowledge that he felt compelled to keep paying profit share because of the ongoing liability of Jamis Johnson. (Ex. 2, Triplett deposition. page 38 line 10-12 )

17. Jamis Johnson and Orvis would engage as many as four attorneys to help with Lexington and with J&A. Jamis Johnson was originally designated as "directing attorney" for J&A and Lexington.

18. One of these attorneys hired in approximately early 1997 was Victor Lawrence. Victor Lawrence received a modest salary and free office, telephone, reception, etc.

19. Victor Lawrence also represented DaNell Johnson in significant individual business matters for example, in litigation with Bruce Giffen, as a creditor in the Utah Agrisource Bankruptcy, against First Security Bank to recover on an agriculture lien on cattle; and also Victor Lawrence represented separately Jamis Johnson in his Utah Bar matters and several other matters including briefly with the SBA.

20. DaNell Johnson profit share checks were sporadic in the credit repair ventures at first.

21. By late 1997 to early 1998, the credit repair ventures started to consistently generate revenue for profit share. Orvis provided verbal monthly accountings of revenue for eClient, Lexington and J&A which Jamis Johnson either kept in a journal or were recorded on "invoices".

22. Profit share was divided between Orvis and DaNell Johnson at a ratio where Orvis received twice what DaNell Johnson received. In other words, Orvis $2/3^{rd}$ - DaNell Johnson 1/3 of profit share. (Ex. 6. Outline Agreement, unsigned, dated 9-23-97.) These ratios were based on Jayson's day to day management of the business affairs and marketing, and on the Johnsons' less active role after the ventures were established.

23. After Hollingshead's departure, and as the Johnsons and Orvis continued to operate the credit repair businesses, tensions arose between the parties.

24. Johnsons would later learn that Orvis, during this time, was secretly taking partnership funds and setting up separate parallel companies to conceal profits and divert profits and not truthfully disclosing profit share revenues by greatly under representing revenues to Johnsons. (Ex. 2, Deposition of Tommy Triplett p. 22, l. 23–p. 26, l. 22–p. 28, l. 25–p 39, l. 8) (See also Ex. 1, Vigil Deposition *supra*. page 49 line 5, page 53 line 10)